(92 App. Div. 382.)

### HUTCHINSON et al. v. SIMPSON et al.

(Supreme Court, Appellate Division, First Department. March 18, 1904.)

1. CORPORATIONS—SECRET PROFIT OF PROMOTERS—RIGHTS OF STOCKHOLDERS—ACCOUNTING.

Appellants obtained options on a large number of malting properties, and set out to organize a corporation with capital sufficient to acquire them. They caused blank contracts in the form of a letter addressed to themselves to be sent to capitalists for subscription. The letter recited: "Each of the undersigned agrees to take the number of shares set opposite his signature hereto, of preferred stock and one-half that number of shares of the common stock of a company to be organized to manufacture and deal in malt with a capital of $30,000,000, one-half thereof 7 per cent. cumulative preferred stock and the remainder common stock, and to pay therefor the amount likewise set opposite his signature to" a certain trust company, "as and when called for by the trust company. It is expected that of the capital aforesaid all but two and a half millions of preferred and one and one-fourth million dollars of common stock to be reserved in the treasury for further corporate uses will be issued in

87 N.Y.S.—24

acquiring certain malt properties on which you and your associates con-
trol options (or other value as you may determine in lieu of any thereof
that may not be acquired) and for working capital and that a part of the
stock so to be issued, to-wit, $9,000,000 of preferred and four and a half
million of common, heretofore underwritten, will be sold on the terms
above stated, deliverable when and if issued." The object was consum-
mated and the contract carried out, but after the allotment of stock there
remained with the trust company $500,000 of preferred stock and $7,-
740,000 of stock which was not required or used in procuring the plants
or furnishing the working capital, all of which appellants, without dis-
closing to the subscribers or to the company, and not being subscribers to
the shares of stock of the company, nor having invested any money in the
enterprise, directed the trust company to deliver to them, and which they
received and appropriated to their own use. *Held*, that an action predi-
cated on the contract to compel the appellants to account for and turn
over to the corporation the stock so appropriated, which was alleged to be
a secret profit made by appellants at the expense of the corporation, does
not lie at the suit of stockholders who were not signers of the contract,
and wherein neither the subscribers nor the corporation were seeking a
rescission of the contract.

   Hatch and Laughlin, JJ., dissenting.

Appeal from Special Term, New York County.

Action by Archibald A. Hutchinson and another against John W.
Simpson and others. From an interlocutory judgment overruling
the demurrer to complaint, defendants appeal. Reversed.

See 77 N. Y. Supp. 197; 79 N. Y. Supp. 1134.

   This action was brought by the plaintiffs, as stockholders of the American
Malting Company, a New Jersey corporation, to require the defendants, other
than the American Malting Company, to account to that company for secret
profits alleged to have been realized by them as promoters of the company.

   The complaint, in substance, avers that the plaintiffs are stockholders in
the defendant company, which is a corporation organized and existing under
the laws of New Jersey, with its principal place of business in the city of
New York. That at the time herein mentioned John G. Moore and the de-
fendants Grant B. Schley, Elverton R. Chapman, Henry G. Timmerman, and
George F. Casilear were copartners engaged in business as bankers and
stockholders in New York City, under the firm name of Moore & Schley,
and that the defendant Caspar H. Eicks was an employé of said firm, and
that the said defendants committed the acts hereinafter set forth. That the
said John G. Moore died, and John W. Simpson and Thomas Thacher were
duly appointed his executors, and made parties defendant in their repre-
sentative capacity. That all the acts herein set forth were done in the city
of New York, and all of the defendants and the plaintiff McElheny are resi-
dents of said city.

   That said malting company was incorporated on or about the 27th day
of September, 1897, with an authorized capital of $30,000,000, one half of
which was and still is preferred stock and the other half common stock, and
which is still divided into 150,000 shares of preferred stock of the par value
of $100 per share, and 150,000 shares of common stock of the par value of
$100. That said defendant company was incorporated for the purpose of
making for said Moore & Schley a secret profit upon certain options which
they held upon other malting properties. That the attorneys who prepared
the articles of incorporation of said defendant company were Messrs. Simp-
son, Thacher & Barnum, of New York City. That the incorporators of said
corporation were Hamilton H. Durand, John J. Treacy, and Frederick
Dwight, all of whom were at the times hereinafter referred to employés in
the office of the firm of Simpson, Thacher & Barnum, which latter firm at
all times acted as the attorneys for Moore & Schley.

   That immediately prior to the incorporation of said company, and in
furtherance of their scheme to make a large secret profit to themselves, they
procured options upon about 25 malting plants situate throughout the United

States, and caused said options to be taken in the name of one Eicks, their employé, for their benefit. That the taking of these options in the name of said Eicks was to make it appear to the public that Moore & Schley, in securing the options, were acting with an independent third party. That in furtherance of the scheme aforesaid, the said firm of Moore & Schley invited the public to subscribe to the capital stock of said company for the purpose of securing the cash requisite for the purchase of the said malting plants and working capital. That as a result thereof a large number of persons signed subscriptions to take $9,000,000 par value of the preferred stock of said corporation, and $4,000,000 par value of the common stock of said corporation, and agreed to pay therefor the sum of $9,000,000. That the aforesaid subscriptions provided all the money necessary to procure said options and to purchase said plants and to provide said working capital, and that said Moore & Schley were not one of said subscribers. That in furtherance of said scheme the said Moore & Schley procured additional subscriptions to the capital stock of said defendant company, which at that time was about to be incorporated from the owners of said malting plants, amounting to $3,000,000, par value, of the preferred stock, and $1,500,000 of the common stock of said corporation. That said last-mentioned subscriptions were paid for by said subscribers conveying to said defendant company the malting plants herein referred to. That the subscriptions first above mentioned, amounting to $9,000,000 preferred and $4,500,000 of the common stock of the defendant company, were in the form of a letter addressed to Moore & Schley, and were made by the subscribers upon the condition and agreement that all of the stock of the defendant corporation issued would be used by said Moore & Schley and their associate, Eicks, for acquiring said malting plant upon which said firm of Moore & Schley had options, and for working capital, and for no other purposes. That the reason said subscriptions were made in the form of a letter as aforesaid was because at that time the defendant company had not been incorporated. That, as a result of all of said subscriptions, $12,000,000 of the preferred stock and $6,000,000 of the common stock of the defendant company were subscribed for by other persons, other than the defendants, immediately preceding the incorporation of the defendant company, and that the stock so called for was issued previous to November 1, 1897, and the $9,000,000 proceeds of the sale of the same as aforesaid was all that was necessary to procure the said malting plants and provide a working capital, and was all that was used by Moore & Schley therefor.

That in furtherance of said scheme Moore & Schley then immediately caused said company to be incorporated, and employed the Guaranty Trust Company of New York to take charge of the collection of said subscriptions, and distributing the money so received, and distributing the stock to which said subscribers were entitled by virtue of said subscriptions. That all of said subscriptions except those made by the owners of said malting plants were made payable to said trust company, which company did collect and receive the money called for by said subscriptions, and did disburse said moneys, and did distribute said stock as aforesaid.

That in furtherance of said scheme said incorporators held their first meeting and elected five directors, all of whom were either employés of Moore & Schley or Simpson, Thacher & Barnum, and that the entire organization of the corporation was in the absolute control of said Moore & Schley and Simpson, Thacher & Barnum.

That in furtherance of said scheme the said board of directors entered into a contract with the defendant Eicks to have said malting plants conveyed to the defendant corporation and furnish a working capital of $2,070,-000, and on its part the said defendant company agreed to issue to said Eicks, or his order, preferred stock in the amount of $12,500,000 par value and common stock in the amount of $13,740,000 par value. That, at the time such contract was entered into, the said Eicks merely had options upon said malting plants, and had nothing to convey. That the expenses of securing said options were small, and that they were paid out of the said $9,000,000 paid by the subscribers as aforesaid. That the said malting plants were conveyed directly to the defendant company, and that the defendant

company, in fulfillment of the contract aforesaid, had issued to said Eicks 125,000 shares of the preferred and 137,400 shares of the common stock of said company.

That in furtherance of said scheme said Moore & Schley ordered the said trust company to issue the stock as aforesaid described, and the defendant Eicks placed in its possession the said 125,000 shares of preferred stock, and the 137,400 shares of common stock, which had been issued by the president and treasurer of said defendant company to said. Eicks as aforesaid. That said trust company carried out said instructions, and disbursed said $9,000,-000 to pay for the said plants and to provide a working capital of $2,070,000 for defendant company, and distributed to said subscribers of said stock 120,000 shares of preferred and 60,000 shares of the common stock of said defendant company. That no further or other stock was needed or used by the defendants or any one else to acquire said options, malting plants, and the working capital, and there remained in the possession of the said trust company 5,000 shares of the preferred stock and 77,400 shares of the common stock of said defendant company. That, as said last-mentioned shares of stock were not needed, they should have been returned to the treasury of the defendant company. Instead, however, of returning said stock to the treasury of the defendant company, the said trust company did, under the directions of said Moore & Schley and Eicks, deliver the said 5,000 shares of preferred and 77,400 shares of common stock to the said John G. Moore and the defendants Schley, Chapman, Timmerman, Casilear, and Eicks, who received the same and appropriated the same to their own use, and have never paid anything therefor.

That the said defendant company has not, nor have its stockholders, ratified the issuance or appropriation of said last-mentioned stock, and that it was done without their knowledge or consent.

That in furtherance of said scheme said Moore & Schley caused directors to resign, and they were elected in their places, and that the defendant Chapman, at their instigation, was elected treasurer, and continued in office, at a salary of $8,000 per year.

That in furtherance of said scheme the said Moore & Schley caused the said defendant company to pay for two years' quarterly dividends of 1¾ per cent. each upon the preferred stock of said defendant company, regardless of the fact of whether the said defendant company had made any surplus earnings. That said dividends amounted to $1,855,000, and that the net earnings of said defendant company did not exceed during that time $700,000. That as a result of paying said illegal dividends the preferred stock of said defendant corporation sold at public sale as high as $88 per share, and the common stock at $38 per share. That as a result thereof the public, believing that the defendant company was fully earning such dividends, bought large amounts of stock, including stock which said Moore & Schley had received as aforesaid, and there are now at least 1,400 stockholders in said corporation.

That as a further result the working capital was dissipated, and the company did not have sufficient funds with which to pay its floating debt, a large portion of which floating debt was called loans; and as a further result the defendant company's credit became so low that new loans could not be obtained, and legal proceedings threatening immediate insolvency became imminent. That as a result, and to procure the necessary working capital, the defendant company was compelled to issue, and did issue, $4,000,000 of first-mortgage 6 per cent. 15-year gold bonds at a discount of 10 per cent., and a large portion of said bonds is still outstanding, and are a first lien on said defendant company's property, and the selling price of the stock at public sale dropped to $19 per share for preferred and to $2.75 per share for common stock.

That in the year 1898 the defendant company purchased additional property for which it paid $1,940,000 of par value of the preferred and $750,000 of the common stock of said company, and that nearly all of said last-mentioned stock was immediately sold by its purchasers, through the said firm of Moore & Schley, to the public at large prices.

That these plaintiffs and the other stockholders did not learn of the fore-

going illegal acts until late in the spring of 1901, and that as soon as they could be advised by counsel, and in August, 1901, the plaintiffs duly demanded of the defendant company and its board of directors that the defendant company institute the necessary legal proceedings against said firm of Moore & Schley to make them account to the defendant company for the said $500,000 of preferred stock and $7,740,000 of common stock of the defendant company which said Moore & Schley had retained as a secret profit as aforesaid. That the said directors and said defendant company have neglected and refused to bring said action. That the defendants Simpson and Thacher are members of the law firm of Reed, Simpson, Thacher & Barnum, who were and still are the attorneys for the defendant company.

That these plaintiffs, upon behalf of themselves and all other stockholders of the defendant company similarly situated, commenced an action to compel said directors to pay back to said company the amount of illegal dividends paid out as aforesaid, which action is still pending. That the present president of the company, Charles A. Stadler, and the present secretary of the defendant company, George F. Neidlinger, and one of the present directors of the defendant company, Seymour Scott, are three of the defendants which the plaintiffs herein have sued for illegal dividends as aforesaid. That the attorneys for all of the said seven directors sued for the illegal dividends as aforesaid, excepting Charles M. Warner, are the aforesaid firm of Reed, Simpson, Thacher & Barnum. That, when the plaintiffs here made their demand upon the defendant company to begin the proceedings herein, said demands were forwarded to the said firm of Reed, Simpson, Thacher & Barnum for advice, and that when the summons herein was served upon the defendant company it was forwarded to the same law firm. That the said defendant company is controlled by persons who are hostile to this action, and it would be useless to expect the defendant corporation to bring this action.

That prior to the commencement of this action the plaintiffs duly demanded of the defendants that they account to the American Malting Company for said $500,000 of preferred stock and $7,740,000 of common stock, but that the defendants have refused and still refuse to do so.

The prayer of the complaint, then, is, on behalf of the plaintiffs and all other stockholders similarly situated:

First. That the defendants be ordered, directed, and compelled to account to the defendant American Malting Company for each and all of said $500,000 of preferred stock and $7,740,000 of common stock retained by them as a secret profit as aforesaid, and any other stock or money retained by them as a secret profit.

Second. That the defendants be ordered, directed, and compelled to account to the defendant corporation for all of said stock issued at or about the time of its organization, namely, $12,500,000 of preferred stock, and $13,740,000 of common stock, and $9,000,000 of money paid by the subscribers to the stock of the defendant corporation.

Third. That a referee be appointed, with power to state an account of the amount of said stock and money that the defendants have received, and for what they have received, then the amount of said stock that they still have, the amount of said stock that they have sold and the prices received therefor, and the price at which the stock of said defendant company has been sold, both by the company and at public sale, and the market value of the stock of said defendant company at such a time after the incorporation of said defendant company as the market value can be determined.

Fourth. That the defendant be ordered, directed, and compelled to pay to the plaintiffs the costs and disbursements of this action.

Fifth. That the plaintiffs have such other and further relief as to the court may seem just in the premises.

To this complaint the defendants separately demurred, upon the ground that it appears upon the face thereof that the complaint does not state facts sufficient to constitute a cause of action, and from the order overruling said demurrer this appeal is taken.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

Thomas Thacher, for appellants.
William M. Bennett, for respondents.

HATCH, J. The complaint states a single and indivisible cause of action. The disposition which this court made of the motion to strike out certain parts of the complaint and to make other averments more definite and certain has settled, as to form and materiality, the averment of matter contained therein. While no opinion was written in making disposition of such matter (77 App. Div. 642, 79 N. Y. Supp. 1134), yet such is the necessary effect of that determination. The cause of action averred in this complaint, stripped of all verbiage, is plain and simple. It charges that Moore & Schley, for the purpose of obtaining for themselves a secret profit, did certain things, and thereby obtained profits to which they were not entitled. The acts which Moore & Schley are charged with doing to effect this result consisted in procuring in the name of the defendant Eicks, who was their agent for the purpose, options for the purchase of about 25 malting plants, located in various states and cities of the United States. As no corporation was at this time in existence to take over these properties, Moore & Schley, for the purpose of procuring funds with which to make a purchase of the several plants upon which their agent held options, procured to be addressed to themselves a letter from proposed subscribers to the capital stock of a corporation thereafter to be formed by Moore & Schley. Among other things, this letter provided for subscriptions to the capital stock of a company to be organized with a capital of $30,000,000, one-half 7 per cent. accumulative preferred stock, and the remainder common stock. The condition of the subscription was that all of the stock issued upon the organization of the company was to be used for the purpose of acquiring from the vendors the malting properties upon which Eicks, as agent, held options, and to provide a working capital. The condition was expressed in these words:

"It is expected that of the capital aforesaid all but two and one-half million dollars of preferred and one and one-quarter million dollars of common stock to be reserved in the treasury for further corporate uses, will be issued in acquiring certain malting properties on which you and your associates control options * * * and for working capital and that a part of the stock so to be issued, to wit., $9,000,000 of preferred and $4,500,000 of common heretofore underwritten will be sold upon the terms above stated, deliverable, when and if issued."

There were no associates of Moore & Schley. Eicks was not an associate, as he was their agent, acting for them, and entirely subject to their control. Pursuant to the agreement contained in the letter, subscriptions to the capital stock were made, and by their terms were payable to the Guaranty Trust Company, which was an agency selected by Moore & Schley. In addition to these subscriptions, the vendors of the malting plants subscribed to $3,000,000 of preferred and $1,500,000 of common stock. Having been assured of sufficient moneys by the subscriptions to carry out the scheme, Moore & Schley proceeded to the organization of the corporation, selecting directors therefor entirely under their control. Simultaneously with the organization of the corporation, they directed the trust company

to call in the amount of the subscriptions, and obtained from such calls $9,000,000, which the subscribers paid to the trust company. This sum was sufficient to pay for all the properties transferred and furnish the working capital of $2,070,000. This being accomplished, Moore & Schley caused the directors to enter into a contract with Eicks for the transfer of the malting plants to the corporation, and, pursuant thereto, the several properties were conveyed directly to the corporation, without the intervention of any third party. The stock was thereupon issued to Eicks, who delivered it to the trust company, and it allotted the shares of stock to the corporations and individuals entitled thereto. After the allotment had been made, there remained with the trust company $500,000 of preferred stock and $7,740,000 of common stock, which was not required or used in procuring the plants or furnishing the working capital. This stock, it is averred in the complaint, was the property of the corporation. Moore & Schley, without disclosing to the subscribers or to the company, and not being subscribers to the shares of stock of the company, nor having invested any money in the enterprise in any form, directed the trust company to deliver to them the last above mentioned shares of stock, and they appropriated the same to their own use, without paying anything therefor, and have never accounted for the same to the corporation or to any other person on its behalf. It is evident that Moore & Schley, from the inception of the enterprise, and in all of the steps taken to the distribution of the stock, stood in relation thereto as promoters. While it is true that they were owners of the options, it is equally true that they procured those options for the purpose of transferring them to a corporation to be thereafter formed, and in the entire transaction they intended to and did make use, not of their own money, but of money paid in by the subscribers, which in amount was sufficient to pay the purchase price of the property and furnish the working capital. The excess of stock was provided for the purpose of being appropriated by Moore & Schley, and the complaint avers that in accomplishing it the scheme took this form. It is evident, therefore, that Moore & Schley, in relation thereto, were promoters. Cook, on the Law of Stock and Stockholders, defines a promoter to be:

"A person who brings about the incorporation and organization of a corporation. He brings together the persons who are interested in the enterprise, aids in procuring subscriptions, generally is the representative of parties who wish to sell property to the corporation or to construct its works." Section 651.

This definition is approved in Dickerman v. Northern Trust Co., 176 U. S. 181, 203, 20 Sup. Ct. 311, 44 L. Ed. 423. In Brewster v. Hatch, 122 N. Y. 349, 25 N. E. 505, 19 Am. St. Rep. 498, where the persons devising and carrying out the scheme were held to be promoters, it was said by Judge Follett:.

"The end which Brown and his associates sought to and did accomplish, as stated in their testimony and as found by the court, was the acquisition of the mining property, by the corporation to be organized, wholly at the cost of such persons as should subscribe and pay for shares to be issued at the rate fixed, and to retain for themselves a majority of the stock without expense or risk."

The scheme in the present case was quite similar, as the averred purpose of Moore & Schley was to procure the subscriptions and obtain the money therefrom to pay for the properties for the corporation, and appropriate the stock without providing any funds for the enterprise or running any risk in the venture, and this they have succeeded in doing. They are, therefore, literally promoters of the transfer of the property and of the organization of the company. Of such relation it has been said:

"A promoter is considered in law as occupying a fiduciary relation towards the corporation. He is an agent of the corporation, and his compensation is derived from it, or from the persons who are the principal stockholders of the corporation. The promoter is not allowed to receive and retain a secret profit given to him by the parties with whom the corporation contracts. Frequently the promoter himself owns or has an interest in the property which is sold to the corporation. In such cases, if he openly acknowledges such interest and deals with the company at arm's length, the transaction is allowed to stand. But if the promoter conceals his interest in the property sold to the corporation, the sale may be set aside, the property returned, and the money recovered back." Cook on Law of Stock and Stockholders, § 651, and cases cited.

This rule of law has received approval in Dickerman v. Northern Trust Co., supra, and in many other cases (Brewster v. Hatch, supra; New Sombrero Phosphate Co. v. Erlanger [1877] L. R. 3 App. Cas. p. 1218; Gluckstein v. Barnes [1900] L. R. App. Cas. p. 240; Colton Improvement Co. v. Richter, 26 Misc. Rep. 26, 55 N. Y. Supp. 486; Hayward v. Leeson, 176 Mass. 310, 57 N. E. 656, 49 L. R. A. 725). If we are right in our conclusion that the averments of this complaint show that Moore & Schley were promoters of the corporation for the purpose of making this secret profit at the expense of the subscribers and the corporation, without making disclosure of the same, then it would seem to follow that they are liable to account for the property, or its proceeds, at the instance of the party who has suffered by the act.

It is averred in the complaint that the stock appropriated by Moore & Schley was the property of the corporation, and was required to be placed in its treasury, and that therefore, it being its property, a wrong has been done to it, and that it has been damaged to the extent of the value of the stock so appropriated. It seems clear that, after the corporation was formed, the stock which was issued was and continued to remain its stock until transferred for some purpose of corporate use, and that no one could appropriate it to himself without giving value therefor. Certainly the board of directors were not authorized to make a gift of it to any person. Moore & Schley had no more authority to appropriate the stock to their use, without giving value therefor, than would the board of directors be authorized to make a gift of it. Taking the stock from the corporation was an appropriation of its property, and, if no value was given therefor, it operated to deplete the property of the corporation or to create an obligation against it, and in law it constitutes a fraud upon the corporation and its stockholders. Under similar circumstances it has been held that an action would lie, either by the corporation or its representatives, to compel the persons who have misappropriated the stock to account for the same, or its value, within well-settled equi-

table principles.   Brewster v. Hatch, supra;  Colton Improvement
Co. v. Richter, supra, and cases cited;  Hayward v. Leeson, supra;
Spaulding v. North Milwaukee Town Site Co., 106 Wis. 481, 81 N.
W. 1064;  Pittsburg Mining Co. v. Spooner, 74 Wis. 307, 42 N. W.
259, 17 Am. St. Rep. 149.   The rule is the same in England.   New
Sombrero Phosphate Co. v. Erlanger, supra;  Gluckstein v. Barnes,
supra;  In re Lady Forest (Murchison) Gold Mine, Ltd. (1901) L. R.
Ch. Div. 581.   In Burland v. Earle, L. R. App. Cases, 1902, p. 83, it
was held that where a director purchased property upon his own mo-
tion, without any mandate from the company directing him so to do,
and under such circumstances that he did not become a trustee, and
subsequently sold the same property to the company at an advance
in price, he could not be compelled to account for such difference by
a shareholder, and that no recovery could be had for such act; that
if any wrong was done, it was a wrong done to the company, and it
was the party to sue to redress the wrong.   There the wrong would
be in the sale, if it fell within any prohibition.   In the present case
the wrong is done to the company, not in any sale, but in the appro-
priation of its stock without giving value therefor.   To the same
effect is Cavendish-Bentinck v. Fenn (1887) L. R. 12 App. Cas. 652.
Many other cases might be cited in other jurisdictions to the same
effect.   So far as I am aware, there has never been any denial of the
jurisdiction of equity to lay hold of such a transaction and grant re-
lief, whether it be between individuals who have suffered, or corpora-
tions.   Getty v. Devlin, 54 N. Y. 403;  Id., 70 N. Y. 504.   The fact
being established, the person or corporation wronged may maintain
the action, and, as we have before observed, in the present case the
wrong was done to the corporation, for the reason that the stock was
its property, and was misappropriated by Moore & Schley.   The
present action is to be treated as one brought by the corporation and
for its benefit, for by the averments of the complaint it appears that
not only has a demand been made upon the corporation to bring the
action and been refused, but that a demand would be unavailing if
one had been made, and this gives the right to the plaintiffs to main-
tain the action.    Flynn v. Brooklyn City R. R. Co., 158 N. Y. 493,  53
N. E. 520;  Hutchinson v. Stadler, 85 App. Div. 424, 83 N. Y. Supp.
509.

It is claimed that such result does not necessarily follow, for the
reason that, in every action brought by a stockholder to enforce a
corporate right, two elements are presented which are essential to the
cause of action.   One, a cause of action in favor of the company
against the party liable to it, and, secondly, a cause of action in the
stockholder's favor to compel the company to enforce such liability.
The argument is that there is a variety of things out of which arises
a right in favor of the corporation which may be enforced in an ac-
tion, which right, however, it is neither desirable nor beneficial to en-
force, and that such determination must of necessity be left to the
control of the directors, charged with the duty of management, and
that, before a stockholder can enforce the right of the company, it
becomes incumbent upon him to establish, as a part of his cause of
action, that it is such right as would of necessity be of benefit to the

corporation to enforce, and in which the·stockholders of the company would be advantaged in property right, or otherwise, by reason of its enforcement. It is now not essential that we pass upon this question as an abstract proposition of law. It may very well be that a contract which may be avoided by a corporation might, nevertheless, be of very great benefit to it, and which in sound business judgment ought not to be avoided, but continued. It may very well be that under such circumstances a court of equity would not enforce a cause of action at the instance of the stockholder suing in the right of the company. With this question, however, we are not presently concerned. It is now only needful to determine whether the company, as such, will be benefited by enforcing its right, and whether the plaintiff has such interest as will be advantaged thereby.

It is evident that, if Moore & Schley have misappropriated this very considerable amount of stock, the company is benefited by its cancellation or a return of its value to its treasury. It certainly will realize what such value is, if it succeed in the action; for, by so doing, it will retire to that extent obligations upon which it is required to pay dividends, or it will have funds in its hands with which to discharge the obligations represented by the stock. Consequently, it appears in the present case to be for the distinct advantage of the corporation to enforce the cause of action. As the retirement of the stock, or payment of its value, increases the property of the corporation or diminishes its obligations, it is of direct benefit to the stockholders. If, therefore, we adopt the view contended for by the learned counsel for the appellant, the present situation answers his requirement, and shows a cause of action in favor of the plaintiffs to enforce the cause of action of the corporation. It would seem, therefore, as if this action was properly brought, and, if the averments of the complaint be established by proof, Moore & Schley are bound to account to the corporation for the stock or its proceeds, and this upon principles of equity so plain that no further discussion of that subject is needed.

There can be no doubt of this rule, unless we have wholly misapplied the rules of law, and made construction of the acts of Moore & Schley not justified· by the actual transaction. It is earnestly insisted by the learned counsel for the appellant that our conclusion can only be based upon such a result. His claim is that no wrong was done by Moore & Schley to the company which gives it the right to call upon them, or any of the defendants, to account. ·He construes the complaint, reaching its simplest form, as averring:

"Moore & Schley caused properties and cash to be conveyed to a company organized at their expense, in which they and their representatives only were interested, receiving therefor a certain amount of stock. With less than the whole amount of stock received, they procured the properties and cash to be conveyed and paid, and had left some of the stock as profits. Might they retain such profits, or were they accountable therefor to the company?"

The argument then proceeds to show that the company procured all of the property under the Eicks agreement; that it knew what it was obtaining; that the only parties in interest issued all of the stock for a particular purpose; that the company was only interested in obtaining the properties for the stock which it issued, and in providing

the working capital; that the stock which it issued was understood by the company and all the parties in interest to be solely issued for such purpose; and that when the company obtained the properties under the agreement, and the money was provided for the working capital by the stock which it issued, and every party then in interest in the company knew the facts, and nothing was secret, it could not be wronged by the appropriation of the stock by Moore & Schley, for the reason that the company obtained all the property and money which it expected to obtain, or which it had any right to obtain, or which the parties understood it would obtain; and, consequently, no wrong was done to the company or to any one else. This it seems to us overlooks entirely the fact that the agreement of subscription, which was addressed by the subscribers to Moore & Schley, provided in terms that all of the stock which was issued upon the organization of the company would be used for the purpose of acquiring the malting properties and furnish a working capital. None of the subscribers to the stock, who furnished all the money and were interested in the corporation, had any notice, nor was any disclosure made to them, that any excess of the issue of stock for these purposes would be appropriated by Moore & Schley. The corporation was interested in procuring the properties, and obtaining its working capital, with as small an issue of capital stock as was possible for the purpose; and Moore & Schley had no more right, in promoting the organization of this company and transferring the property to it, to appropriate to themselves the excess of the stock issued over and above what was necessary for a purpose which the subscription agreement provided, than they would have had to take an equivalent in money from the treasury of the company. True, it was not secret from them, nor was it secret to the board of directors, nor was it secret to those having control of the company; but Moore & Schley stood in such relation to the company that they were required to protect its property and interests, and to act towards it with the utmost good faith, for they were making a creature which could take and hold the properties upon which they held options, and under which it could acquire title. Being vendees of the property, through their agent, every element of open dealing was required, not alone of themselves and of the board of directors, which they controlled, but to the company that was purchasing from them property; and when its obligations were taken, because it had issued an excess of stock beyond that which was necessary to accomplish the purpose of its creation, a wrong was committed against the company, because it was an appropriation of its property, for which nothing was given. Such transactions can no more be supported and upheld than could be a gross overvaluation in the purchase price of the property.

It is said, however, that the subscription agreement did not constitute a contract between the subscribers thereto and the corporation; that, as it acquired no interest thereunder, it has no right upon which an action can be founded, and it is therefore entitled to no relief. By the terms of this instrument each subscriber agrees to take shares of preferred and common stock of the corporation when and if issued. There is no agreement to take any shares from Moore & Schley at

any time, nor does the agreement contemplate that any shares issued to Moore & Schley will be delivered by them to the subscribers as such. The language is that each subscriber will pay to the Guaranty Trust Company of New York the amount of his subscription to the shares of stock of a corporation to be organized, when called for by the trust company. It is with the corporation that the contract is made to take the shares when it comes into existence and issues its stock. There are no words which impose upon Moore & Schley an obligation to issue, sell, or deliver to any subscriber any stock issued to them or which may come into their possession. They are mentioned as holding options upon malt properties, and that it is expected that a certain number of shares will be issued for such properties and to secure the working capital. With that sale the subscribers had no interest, save in the amount of the purchase price. Such matter was purely between Moore & Schley and the corporation. The subscribers, it is true, approved of the proposed plan; but that did not change their relations as purchasers of the stock. When they paid in the amount of their subscriptions, if the corporation, having come into existence, refused to deliver the shares to which the subscribers were entitled, the latter, it seems to me, would have had an undoubted right to compel such delivery by action against the corporation. Under such circumstances no right of action would accrue against Moore & Schley for a failure to deliver the shares, as they did not contract to deliver any, either to the subscribers or to any one else. They were bound to pay for the properties which they sold to the corporation, but they were not required to deliver stock for such purpose. If the subscriber could compel a delivery of his shares of stock, so likewise the corporation could compel payment of the subscription, and Moore & Schley, by the terms of this agreement, had no more interest in such question than would any other vendor of property to the corporation, or any other shareholder of its stock. Certainly this would be true to the extent of the money provided for a working capital. That at all times belonged to the corporation, and I take it that there can be no distinction between the amount of the subscription set aside for the working capital, and for which the corporation issued its stock, and that portion of the subscription which went to pay for the properties purchased. In each case the money was procured from the subscribers by virtue of the contract between such subscribers and the corporation. With such question Moore & Schley were not concerned, save as promoters of the corporation and vendors of the property which they sold. If this be the proper construction of the subscription agreement, it is evident that the relation was the ordinary one of subscriber to the capital stock of a corporation. The rights in such relation are reciprocal in the corporation to compel payment, and in the subscriber to compel delivery; and, this being the relation, it must follow that the shares of stock were the property of the corporation until paid for. When its shares were issued, it was entitled to receive either money or property therefor; and, if it received neither, then a right of action accrued in its favor against the persons who acquired its shares without giving value therefor.

The cases relied upon by the defendants do not support their several contentions. In Parsons v. Hayes, 14 Abb. N. C. 419, the transfer was of property to the corporation. The stock was issued by it for the property, which it obtained at a gross overvaluation; but the only persons interested therein at that time were the persons who owned the property, who transferred it to the corporation, and who received all of its stock. While occupying that relation, neither the company nor any one connected with it could by any possibility be damaged or deceived. The transaction enabled the owners of the property to place such value upon it as they chose, and represent it to be of that value in stock which was issued. The company by this arrangement could not be damaged, nor could the individuals whose active efforts created the relation, and who were the owners of the entire stock issue. If anybody could be deceived, they were the subsequent purchasers of the stock, who might pay for it upon the supposition that the property which it represented was worth the value of the stock issued. Very likely such condition operated as a misrepresentation of the value of the stock, and might result in perpetrating a fraud upon vendees; but it did not damage the company, nor did the transaction give any right of action in its favor against any one. The cause of action under such circumstances would necessarily rest in deceit, and the only person damaged would be the purchaser; and so the court held that an action could not be maintained, either in the name of the company, or by a stockholder suing in its interest, as no wrong to it had been done. This holding is fully supported upon every satisfactory reasoning in the case of In re Ambrose Lake Tin & Copper Mining Co. (1880) L. R. 14 Ch. Div. 390. The transaction was in all respects similar to that which obtained in the Parsons Case, supra, and the several opinions delivered therein clearly point out the distinction between such a case and the one we are now considering. In that case the vice warden, having charge of the liquidation of the company, sought to compel an accounting by the incorporators for the profits they had made by the incorporation, and it was held that no such action would lie, for the reason that the company was not damaged, although it might have been organized, and probably was, for the purpose of deceiving the public and the purchasers of the stock, yet that such act did no mischief to the corporation, and therefore it had no cause of complaint.

In the recent case of Tompkins v. Sperry, Jones & Co. (Md.) 54 Atl. 254, the Court of Appeals of Maryland determined that a bill in equity would not lie at the instance of a receiver of the company for purposes of liquidation for a claimed injury done to that company under similar circumstances. Therein the defendants Sperry, Jones & Co. were the promoters of a corporation for the consolidation of several breweries; one brewer made a conditional contract for the transfer of his brewery; its fulfillment was dependent upon the procurement of other contracts of a similar character for the transfer of other breweries. The conditions upon which the contract was made were not complied with, and it consequently never became a binding instrument, nor fixed the terms upon which Sperry, Jones & Co. became obligated to organize the company, or the brewer to convey

his property. Subsequently Sperry, Jones & Co. purchased this property in their own names, and thereafter transferred it to the company at a less price than that for which the conditional contract called, taking payment therefor in the stock and bonds of the company. It was held that as to that transfer Sperry, Jones & Co. occupied no fiduciary relation to the company. All of the property in that case which was transferred to the company was owned by the defendants Sperry, Jones & Co., and they conveyed this property to the company, taking in exchange therefor its stock and bonds. No prospectus was issued, no invitation was extended to any person or to the general public at that time to subscribe for the stock or bonds of the company, and none had been subscribed for. The sole persons in interest were Sperry, Jones & Co., who owned the property which was transferred, and in the formation of the company they owned the stock and bonds; consequently the transaction constituted a simple exchange of property for stock and bonds. No fiduciary relation existed, nor could it exist in such a transaction between the company and Sperry, Jones & Co., and consequently no one could be defrauded, as the only persons in interest owned both the property and the stock and bonds. In addition to this, all of the stockholders present at a meeting, with full knowledge of the situation, ratified the transaction, and authorized an additional issue of stock and bonds for other property transferred by Sperry, Jones & Co. Nothing was concealed. The value of the property was understood, and the character of the exchange was consented to by every party in interest. The case in principle is precisely like Parsons v. Hayes, supra. When the property was transferred and the stock and bonds were issued to the defendants, if they had continued to hold the same and carry on the business, no one could have any just cause of complaint. In selling the stock to purchasers, as they subsequently did, they stood in the relation to such transaction and the purchaser as vendor and vendee, and were subject only to the rules which obtain in such relation. No cause of action by reason of that transaction could accrue in favor of the company or its representatives upon liquidation, and the court so held, stating that, if there was any liability, it was in favor of the purchasers of the stock, if they had been defrauded upon a sale of the same. The court cites with approval the case of Salomon v. Salomon, L. R. App. Cases, 1897, p. 22, In re Ambrose Lake Tin and Copper Min. Co., supra, and Morawetz on Corporations, vol. 1, § 290. But the court had no difficulty in reconciling these cases and their doctrine with that announced in Gluckstein v. Barnes, supra, and Erlanger v. New Sombrero Phosphate Co., supra, and stated, "There is no real conflict between these authorities."

We do not find it necessary to examine in detail all of the cases cited by the learned counsel for the appellants in support of his proposition. The cases to which attention has been called are those which are mainly relied upon by him, and are as strong in support of his contention as any to be found. All of the cases which he cites and relies upon, save Colton Improvement Co. v. Richter, supra, which he criticises as being erroneously decided, fall into one of two classes: First, those cases where one or more persons own an entire property

or business, incorporate a company for purposes of convenience, or
to prevent complication in dealing with the property, and the organi-
zation so formed does not intend or expect any other persons to join
them as stockholders.   In such transaction it is of no consequence
what value is attached to the property, or what is the amount of the
stock or bonds issued, as the company and its creators do not repre-
sent conflicting interests, and no fraud upon the company is there-
fore possible.   Such a case is represented in this state by Seymour
v. Spring Forest C. Ass'n, 144 N. Y. 333, 39 N. E. 365, 26 L. R. A.
859, and in England by Salomon v. Salomon, supra, and many others.
Second, where a corporation is formed by owners of property, and
the property is taken in exchange for stock and bonds at an exces-
sive overvaluation, and, after the organization is completed and the
property is represented in stock or bonds, they are sold to the public.
It will be found in all such cases that the organizers of the company
owned the property or furnished the money to buy it before the crea-
tion of the company, and sold the shares to the public after the com-
pany had been formed and the stock had all been issued.   Under
such circumstances, as we have seen, if any fraud is perpetrated, it
is not upon the company but upon the purchasers of the stock, and
no action will lie to redress any wrong by the company, because it
has suffered none.   If fraud be perpetrated in the sale of stock, the
action is in deceit, and lies in favor of the individual wronged against
the person doing wrong.   Such case falls within Parsons v. Hayes,
supra; Tompkins v. Sperry, Jones & Co., supra; Barr v. N. Y., L.
E. & W. R. R. Co., 125 N. Y. 263, 26 N. E. 145; and Drake v. N.
Y. Suburban Water Co., 26 App. Div. 499, 50 N. Y. Supp. 826—in
this country; and In re Ambrose Lake, etc., Co., supra; In re Lady
Forest (Murchison) Gold Mine, Lim., supra, in England.

It is evident that the transaction averred in this complaint falls
within neither class of these cases, for here this property was not
transferred nor the corporation created as matter of convenience
in holding and disposing of property in which those in interest were
both owners and incorporators.   Nor were Moore & Schley owners
of the property purchased with their money.   Nor was the corpora-
tion formed for the purpose of taking over the property and issuing
all of the stock therein to the owners of it, so that both interests com-
bined in ownership and were changed in form only.   Such was not
the condition which existed, nor do the facts correspond to make it
such in relationship.   Rather does it fall within a third class, where
the promoter, for his own interest, and in order to make a profit, pro-
motes a company and invites the public to subscribe for shares not
yet issued, but thereafter to be issued, by which the property which
is to become the assets of the corporation is to be purchased with
money thus furnished, and the whole scheme is consummated with-
out pecuniary aid on the part of the promoter, and without risk of any
of his own money in the transaction.   In the first and second classes
named there is and can be no fiduciary relation between the owners
of the property and the corporation or its creators.   Both own all
there is in property and in stock.   They deal with themselves, and
there is no obligation of good faith, because nothing, either person

or corporation, is in existence or comes into existence, requiring such observance. In the third class, from beginning to end, it deals with others and with their property and money in order to make a profit. From beginning to end it makes use of means by which money is obtained, not from themselves, but from outside parties, and by and through which alone it is enabled to fulfill and carry out the scheme. Under such circumstances the promoter continually stands in a fiduciary relation to persons and corporation. His relation is fiduciary when he invites subscriptions to shares of stock; his relation is fiduciary when, having obtained the money, he causes the corporation to be formed to take over the property to be purchased by the money thus obtained; and it continues to be fiduciary in all dealings with the corporation during the time it is under such control. Under such circumstances the language of Lord Penzance in Erlanger v. New Sombrero Phosphate Co., supra, finds precise application:

"First, that the company never had an opportunity of exercising, through independent directors, a fair and independent judgment upon the subject of this purchase; and, secondly, that this result was brought about by the conduct and contrivance of the vendors themselves. It was the vendors, in their character of promoters, who had the power and opportunity of creating and forming the company in such a manner that, with adequate disclosures of fact, an independent judgment on the company's behalf might have been formed. But instead of so doing, they used that power and opportunity for the advancement of their own interests. Placed in this position of unfair advantage over the company which they were about to create, they were, as it seems to me, bound, according to the principles constantly acted upon in the courts of equity, if they wished to make a valid contract of sale to the company, to nominate independent directors and fully disclose the material facts. The obligation rests upon them to show they have not made use of the position which they occupied to benefit themselves."

In speaking of the opportunity which gives to persons unlimited power to create corporations, Lord O'Hagan says (s. c., p. 1255):

"It required in its exercise the utmost good faith, the completest truthfulness, and a careful regard to the protection of the future shareholders. The power to nominate a directorate is manifestly capable of great abuse, and may involve in the misuse of it very evil consequences to multitudes of people who have little capacity to guard themselves. Such a power may or may not have been wisely permitted to exist. I venture to have doubts upon the point. It tempts too must to fraudulent contrivance and mischievous deception, and, at least, it should be watched with jealousy, and restrained from employment in such a way as to mislead the ignorant and the unwary. In all such cases the directorate nominated by the promoters should stand between them and the public with such independence and intelligence that they may be expected to deal fairly, impartially, and with adequate knowledge in the affairs submitted to their control."

In that case the property was purchased by a syndicate, who transferred it to the corporation at an excessive valuation, and it was held that the relation between the company and the persons transferring the property was fiduciary in character, and they owed to it the obligation.

In Gluckstein v. Barnes, supra, the syndicate was formed to purchase the property at a judicial sale and make a resale to the company subsequently to be formed. The syndicate bought some of the debenture bonds at a discount, and also a mortgage, by which they made a profit of £20,000. They purchased the property at the sale

for £140,000, and contracted to transfer it to the company for £180,-000, concealing the profit which they made in the purchase of the debentures and the mortgage. After the company was formed they issued a prospectus, stating the price for which the property was purchased and the price at which it would be transferred to the company, but did not disclose therein the £20,000 secret profit, although the prospectus did state: "Any other profits made by the syndicate from interim investments are excluded from the sale to the company." Under these circumstances it was held, in an action on behalf of the company to compel an accounting of the undisclosed profits which had been made, that, although it appeared that the company, its trustees, and directors were the same persons who bought in the property, formed the company, and offered its debenture bonds for sale, yet that they owed to the subscriber who paid for the debenture and bonds the duty of fully disclosing all of the profits which they made, and that they were bound to protect the company in such matter as trustees and directors, and that their failure so to do was not only a fraud upon the purchasers of the debentures and bonds, but was a fraud upon the company, and they were bound to account to it for the undisclosed profits which they made. We are not required to go so far, as does the doctrine announced in that case, to sustain the cause of action averred in this pleading.

It is evident, therefore, that by the averments of this complaint Moore & Schley fall into the category of promoters, owing a fiduciary relation to the company which they created, and charged with the obligation of protecting its interests, and they could not make a profit out of the company in the transaction without fully disclosing the same, and dealing in respect thereto fairly and openly. Such open and fair dealing is not had, and proper protection is not given to the corporation which they control, when, without giving anything of value, they take the stock issued by the company and appropriate it to their own use. Under such circumstances, and well within the authorities which we have cited, a wrong is done to the company, and a case is created where equity will lay hold of the transaction and compel an accounting. Nor is the rescission of the contract of sale the remedy in such a case. There are no averments in this complaint showing or tending to show that there was any wrong done to the corporation in transferring to it the malting properties. From all that appears, the corporation received full value for the stock which it gave in exchange for the properties, and such transaction is not tainted in any respect with wrongdoing. There is therefore no ground upon which a rescission of the transfers of the malting properties could be based. There is a class of cases holding that rescission of the contract is the proper remedy of the company where it has been defrauded in making it, and, if no changes have taken place in the property or right accrued in connection with it, rescission may be proper. Where, however, there have been changes, a rescission will not be made, and an action lies for an accounting. Yale Gas Stove Co. v. Wilcox, 64 Conn. 101, 29 Atl. 303, 25 L. R. A. 90, 42 Am. St. Rep. 159; In re Olympia, Lim. (1898) L. R. Ch. Div. vol. 2, p. 153. The only remedy which can be invoked in this case is to compel

Moore & Schley to make restitution of the stock which they have taken and converted to their own use, or to account for the same, or its proceeds, if they have disposed of it. The corporation, under the averments of this complaint, has made no contract which requires rescission. It avers in legal effect a breach of trust resulting in a conversion of this stock by the defendants Moore & Schley, and it is to recover it or its value that the action seeks, and the action will clearly lie for such purpose.

It is further claimed that the plaintiff has been guilty of such laches as defeats the right to maintain this action. Laches is ordinarily to be presented by answer, and not by demurrer. Sage v. Culver, 147 N. Y. 241, 41 N. E. 513; Zebley v. F. L. & T. Co., 139 N. Y. 461, 34 N. E. 1067. The complaint avers the time when the misappropriation was discovered, and, if there has been any laches in prosecuting the claims, it can be made to appear upon the trial; the court will not dispose of such question upon demurrer. The complaint is sufficient to show that of the secret profit no one had notice, save Moore & Schley, and the directors of the company, whom they controlled, and the averments in this respect are sufficiently broad to permit showing that there was no ratification or knowledge by the plaintiffs or by their predecessors in title. Under such circumstances there is no basis upon which to predicate an estoppel. Estoppel, like laches, usually constitutes matter of defense. Estoppel in this case cannot be enforced, based upon the acquiescence of the directors of the company and Eicks, the holder of the stock, and this for the reason that Eicks' holding was fiduciary for the company and those legally entitled to the stock, and no transfer of it could be justified under the facts averred, except to those who subscribed for it, and who were entitled to the respective allotments, either for property or cash. The acts leading up to the appropriation by Moore & Schley of the stock were a breach of the relation which existed between them and the company, which they were bound to protect, and out of such circumstances there could arise no estoppel as against subsequent holders of the stock who took the same without knowledge of the facts. Promoters are held to liability, even though all of the stock is issued in the first instance to them, and they have control of the company. Brewster v. Hatch, supra; Pittsburg Mining Co. v. Spooner, supra.

We conclude, therefore, that upon the main questions this complaint states a good cause of action, and the demurrer thereto was properly overruled. As to the demurrer of the defendant Eicks, the allegations are that he acted as the agent of Moore & Schley, and it is not shown that he is liable to respond in any wise for any of his acts. While he may not be a necessary party to the action, yet inasmuch as the transactions were largely through him, he is a proper party, and, the action being in equity, he is properly made a party within section 447 of the Code of Civil Procedure, as he may have some interest in the controversy.

In support of the demurrer of the executors of John G. Moore, deceased, it is claimed that it must be sustained, for the reason that no facts are alleged showing that complete satisfaction cannot be pro-

cured from the surviving members of the firm of Moore & Schley, and that such averment is essential to the statement of a cause of action against them. Assuming that the complaint is to be treated as averring a cause of action against Moore & Schley as copartners, we think the contention of the executors cannot be sustained. It may be admitted that at common law an action could not be maintained, even in equity, which joined surviving partners with the personal representatives of a deceased copartner, in the absence of allegations showing insolvency of the surviving copartners. Such seems to be the rule announced in Lawrence v. Trustees, etc., 2 Denio, 577. The rule was otherwise in England, where it was finally settled that in an action in equity the personal representatives of the deceased copartner could be joined, even though a legal remedy existed against the survivors of the copartnership. Williams on Executors (6th Am. Ed.) 1747. Whatever doubts may have existed in this state respecting the right to make personal representatives of a deceased copartner parties with the survivors in an action in equity where equitable relief may be properly invoked, it was set at rest by the provisions of section 118 of the old Code, where the right was expressly given, and such rule has been continued in the provisions of section 447 of the Code of Civil Procedure. In Voorhis v. Child's Executor, 17 N. Y. 354, Judge Selden, writing for the court, exhaustively considered the subject. That was an action at law for the recovery of a debt, wherein the personal representatives were joined, and, in sustaining the demurrer that the joinder could not be had in a legal action, the court stated:

"As, therefore, the present action must be regarded as one of a purely legal nature, brought against the surviving partners upon their legal liability, it follows that the executors of the deceased partner, who is liable only in equity, were improperly made parties."

In Potts v. Dounce, 173 N. Y. 335, 66 N. E. 4, the action was also one at law to enforce a debt, and Judge Gray, in writing for the court, therein said:

"But, while the legal rule of liability has been changed, the rule of procedure is not. When the personal representatives of the deceased joint debtor are directly proceeded against at law, the plaintiff should still allege and prove the insolvency, or inability to pay, of the survivors."

Hotopp v. Huber, 160 N. Y. 524, 55 N. E. 206, was likewise an action at law, and the same rule was applied. It must therefore be now regarded as settled that in an action at law the personal representatives of a deceased copartner are not proper parties, unless it be averred and proved that the survivors are insolvent and unable to meet the demand sought to be established. In an equitable action the rule is otherwise, and the personal representatives are proper parties, without averring or proving the insolvency of the survivors. The rule, however, that the representatives of deceased copartners could not be joined in the first instance, or proceeded against in equity, was never extended to that class of equitable actions which involved a breach of trust. Where the relations out of which arise the cause of action are predicated upon an obligation involving a wrong,

or violation of duty as agent or trustee, the personal representatives were always proper parties in the settlement of the controversy involving an examination of the quality of the acts. Bailey v. Inglee, 2 Paige, 278; Cunningham v. Pell, 5 Paige, 607; Sortore v. Scott, 6 Lans. 271. And in similar actions to this, involving the same relief which is sought for herein, personal representatives have been regarded as proper parties. Getty v. Devlin, 54 N. Y. 403; Id., 70 N. Y. 504; Erlanger v. New Sombrero Phosphate Co., supra. It is quite possible to construe this complaint as stating personal acts of the several defendants therein in the accomplishment of the scheme, for its averment is that the "said Moore and the said defendants Schley, Chapman, Timmerman, Casilear and Eicks committed and performed the acts hereinafter set forth." This is an affirmative allegation of personal acts upon the part of the defendants, and the characterization of such acts thereafter under the name of Moore & Schley is rather matter of brevity than of substance. If the complaint is ambiguous in this respect, it is doubtless to be taken most strongly against the pleader. But whether this construction be given to it or not, we do not consider of consequence, as we have reached the conclusion that, this being inherently an equitable action to redress a wrong, all of the parties affected thereby are properly made parties.

It follows from these views that the interlocutory judgment should be affirmed, with costs, with leave to the defendants to withdraw the demurrer and serve an answer within 20 days, upon the payment of costs in this court and in the court below.

LAUGHLIN, J., concurs.

VAN BRUNT, P. J. This action was brought by certain stockholders of the defendant company, in the interest of the company, to recover from the firm of Moore & Schley what is termed in the complaint "a secret profit made at the expense of the defendant company, its stockholders and creditors."

It seems to me that the fundamental error which underlies the whole of this complaint is the assumption that the defendant company had any interest in, or acquired any rights by, the contract, Exhibit A annexed to the complaint, and which is erroneously styled a "stock subscription," which reads as follows:

Messrs. Moore & Schley—Gentlemen: Each of the undersigned agrees to take the number of shares set opposite his signature hereto of the preferred stock, and one-half that number of shares of the common stock of a company to be organized to manufacture and deal in malt with a capital of $30,000,000 one-half thereof 7% cumulative preferred stock and the remainder common stock, and to pay therefor the amount likewise set opposite his signature to the Guaranty Trust Company of New York, at its office in New York City, as and when called for by said trust company.

It is expected that of the capital aforesaid all but two and one-half millions of preferred and one and one-quarter million dollars of common stock to be reserved in the treasury for further corporate uses, will be issued in acquiring certain malt properties on which you and your associates control options (or other value as you may determine in lieu of any thereof that may not be acquired) and for working capital and that a part of the stock so to be issued, to wit: nine million dollars of preferred and four and one-half

million dollars of common heretofore underwritten, will be sold upon the terms above stated, deliverable when and if issued.

Dated, New York September 27th, 1897.

| Signatures. | No. of Shares of Preferred Stock. | Prices. |
|---|---|---|
|  |  |  |

This paper was simply a contract between the signers thereof and Moore & Schley, whereby the signers agreed to buy from Moore & Schley the number of shares set opposite their respective names, at a price specified, of a company to be organized upon the basis therein provided; and Moore & Schley agreed to sell certain of said shares to the signers at the price named, deliverable when and if issued. It seems to me reasonably clear that, if the signers had failed to receive the stock subscribed for when issued, they would have had no cause of action against the defendant company, their only recourse being against Moore & Schley; and, if any of the signers had failed to make payments as agreed in the contract, the defendant company would have had no cause of action, Moore & Schley being the only parties aggrieved. In other words, there was no contract between the signers of that paper and the defendant company.

There is no claim but that the company was organized as required by the contract, nor that the expectations referred to therein were not carried out to the letter. All the malt properties referred to therein were acquired by the defendant company, and ample working capital was provided. Moore & Schley made no secret of their interest in the properties which were to be acquired by the company. The contract expressly declared that Moore & Schley and their associates controlled the properties which were to be acquired by the company, and the only inference to be drawn from its language is that all the stock of the company, except the amount reserved in the treasury for further corporate uses, was to be issued to Moore & Schley and their associates in payment for the properties acquired and to provide working capital. All the stock referred to in the contract as to be issued for acquiring property and working capital was issued to Moore & Schley, as contemplated, for the properties therein referred to and for working capital. I say issued to Moore & Schley, because I treat Moore & Schley and Eicks as one, for the purposes of this opinion. There is no claim but that Moore & Schley caused every piece of property contemplated to be conveyed to the company, and provided an ample working capital.

It is said that Moore & Schley did not themselves convey the properties to the company, but that they were conveyed by the respective owners. The contract states that Moore & Schley and their associates held options upon this property. They therefore controlled it; and the fact that they caused the owners of the property to convey directly to the company, in fulfillment of their contract with the company to convey or procure to be conveyed this property to the com-

pany, in no manner affected their relations to the transaction. The language of the contract of Eicks with the company clearly contemplated that Moore & Schley and Eicks were not themselves to give the title. Eicks contracted to convey or procure to be conveyed. If one man holds a contract for the sale of real estate by another, which he assigns to a third party, it certainly is not an unusual transaction for the seller to convey directly to the assignee of the contract. There was therefore nothing unusual in the fact that the owners of this property conveyed directly to the company. Moore & Schley, as far as the company was concerned, were the sellers of this property, as it appeared upon the face of the contract that it was contemplated that they should be; and there is no hint or allegation throughout the complaint but that the company received full value for the stock it issued. The whole foundation of the complaint resting upon the contract (Exhibit A), in which the defendant company never had any interest, no cause of action is set out.

The demurrer should be sustained.

INGRAHAM, J., concurs.

INGRAHAM, J. The cause of action sought to be enforced is one in favor of the corporation the American Malting Company to compel the individual defendants to account to that corporation for 5,000 shares of the preferred stock and 77,400 shares of the common stock received by them, and any other stock or money retained by them as a profit. There is no wrong done to the plaintiffs, either individually or as stockholders, by any of the defendants, for which redress is asked, and the action must be treated as if the corporation were the plaintiff, and to sustain it the complaint must allege facts which give the corporation a right to call the defendants to account.

The complaint contains many allegations as to the intent of the defendants, and the purposes and objects that they had in view; but I suppose that the liability of the defendants must depend upon what they did, not upon what they proposed or intended to do; and, if what it is alleged they did gives to the corporation no right of action, this judgment cannot be sustained. The fact that the defendants, or some of them, endeavored to make it appear to the public, to the stockholders of the defendant company, and to the defendant company that the defendant company was dealing with an independent party is not at all material, unless the endeavor was successful, and neither the public nor the stockholders are before the court asking for relief.

The complaint alleges that the American Malting Company was incorporated under the laws of the state of New Jersey on September 27, 1897, with an authorized capital of 300,000 shares, of the par value of $100 each, of which 150,000 shares were preferred stock and 159,999 shares were common stock, for the purpose, as alleged in the complaint, of making for the defendants composing the copartnership of Moore & Schley "a credit profit from the purchase at or about the time of the incorporation of said defendant corporation of certain options or the malting plants called for by said options," for the purchase out of the sale of defendant's capital stock of other plants and property needed in the business of the defendant company, as the necessity for the purchase

of the same should arise. The incorporators were three in number, all of whom were the employés of the attorneys of Moore & Schley, who drew the articles of incorporation and acted as employés and representatives of and at the request and instigation of Moore & Schley. Prior to the incorporation of the defendant company, Moore & Schley had secured options to purchase about 25 malting plants situate throughout the United States, and caused such options to be taken in the name of the defendant Eicks, their employé, for their benefit. Immediately prior to the incorporation of the defendant company, Moore & Schley invited the public to subscribe to the stock of the corporation, and a large number of persons signed subscriptions to take preferred stock of the par value of $9,000,000 and common stock of the par value of $4,500,000, and agreed to pay therefor $9,000,000, one-half of said sum on September 28, 1897, and the balance on October 1, 1897, said subscriptions to be paid to the Guaranty Trust Company. The subscription was in the form of a letter to Moore & Schley, a copy of which is annexed to the complaint. This letter speaks for itself, and shows that the allegations of the complaint as to its contents are inaccurate and misleading.

The defendant corporation having been incorporated on the 27th of September, 1897, the incorporators met on September 28th and elected five directors, who were employés of the attorneys for Moore & Schley, or representatives of Moore & Schley, and said directors elected officers, one of whom was one of the attorneys of Moore & Schley, and the others employés of such attorneys. On the said 28th of September, at the instigation and request of Moore & Schley, the officers and directors caused the defendant corporation to enter into a contract with the defendant Eicks, by which Eicks agreed to convey or cause to be conveyed to the defendant corporation the said malting plants and to furnish a working capital of $2,070,000, and the defendant corporation agreed to issue to Eicks or to his order preferred stock of the par value of $12,500,000 and common stock of the par value of $13,740,000. A copy of this contract is annexed to the complaint. The complaint further alleges that said trust company, on the joint order of the defendant Chapman, the president of the defendant corporation, and Eicks, paid for the malting plants purchased from Eicks under his contract with the corporation, and paid to the corporation $2,070,000 working capital out of the $9,000,000 paid to Moore & Schley on the purchase of the stock; that there remained in the hands of the trust company 5,000 shares of preferred stock and 77,000 shares of the common stock of said corporation, which should have been returned to the treasury of the defendant corporation, and that this said stock, instead of being delivered to the company, was delivered to the individual defendants, who appropriated it to their own use, and have not accounted for it to the corporation.

These are the substantial allegations of the complaint as to the organization of the defendant corporation and the issue of the stock. The allegations of the motives and intent of the defendants (which are not alleged to have been carried out), and of other transactions of the corporation, do not appear to me to be material in determining the legal relation that existed between Moore & Schley and the corporation. It

is not alleged but that Eicks complied with his contract, and conveyed or caused to be conveyed to the defendant corporation the malt-producing plants therein specified, nor is there any allegation that the plants acquired by the defendant company were not worth what the company paid for them. The corporation was organized to acquire and work these plants. It acquired such plants, issuing therefor a part of its capital stock at a price which, so far as appears, was not excessive. It does not ask to set aside the transaction, but holds on to what it acquired in consideration of the issue of its stock. It is not alleged that there was any secret about the relation in which Moore & Schley stood to the company or to the property purchased by the company. The incorporators, the directors, the officers, and Eicks, who made the contracts, and the purchasers of the stock from Moore & Schley, had, so far as appears, knowledge of all the facts that are alleged in the complaint. The contract between the corporation and Eicks was completed. The company have the title to and are in possession of all the property that it was incorporated to acquire, and which it had purchased by the issue of its capital stock, and Eicks, or Moore & Schley, or their assignees, were in possession of the stock issued for that property. Leaving out of view for a moment the sale of stock by Moore & Schley under what is called the "subscription agreement," upon the completion of the contract between the company and Eicks, Eicks having performed his contract by conveying or causing to be conveyed to the corporation a good title to these malting properties, furnishing an adequate working capital, and, as a consideration therefor, having received from the company this stock which the company had agreed to issue to him for the plants and working capital, is it not perfectly clear that the company could not recover any portion of the stock that it had issued to Eicks as the consideration for a good title to the malting plants and for supplying the working capital, irrespective of the amount that Eicks had been required to pay for the acquisition of the plants or assuring the corporation a good title thereto? Neither Moore & Schley nor Eicks was an agent of the company authorized by it to purchase these plants. Neither of them were officers or directors of the company. The relation which they bore to the company was that of independent contractors agreeing to convey or cause to be conveyed to the company certain property for which the company agreed to issue certain shares of stock. To say that Moore & Schley were in fact the company, and that its incorporators, officers, and directors were named by them and acted at their instigation, does not change the situation, for then Moore & Schley were dealing with themselves, and, as they owned all the stock after it was issued, no one was injured or deceived. It is alleged, however, that Moore & Schley had made a contract to sell a part of the defendants' stock that was to be issued to Eicks as a consideration for his securing to the defendant corporation the title to these malting properties, and a working capital, for an amount which enabled them to make the payments necessary to vest the malting properties in the defendants and furnish the working capital required, so that they could retain a portion of the stock as the profits of the transaction; and that gave the corporation a right of action which it would not have had but for that sale. The corporation was incorporated on

September 28, 1897, and on September 29th the contract was made with
Eicks. There is no allegation in the complaint when the agreement
with Moore & Schley for the purchase of the stock was actually signed,
but it was dated September 27th, the day before the company was in-
corporated, and two days before the contract for the purchase of the
property was executed. It certainly cannot be assumed that this con-
tract for the sale of stock for $9,000,000 was obtained upon the date of
the letter, and it could not have been obtained before. The subscrip-
tion, or, more properly, the agreement to purchase the stock from
Moore & Schley, was in form a letter to Moore & Schley. By it each
subscriber agreed to take the number of shares set opposite his name in
a corporation to be organized to manufacture and deal in malt, with a
capital of $30,000,000, and to pay therefor the amount, likewise set op-
posite his signature, to the Guaranty Trust Company of New York,
as and when called for by the said trust company. It was stated in
the letter that, of the capital stock of the company, all but two and a
half million dollars of the preferred and one and a quarter million dol-
lars of the common stock, to be reserved in the treasury, was to be is-
sued in acquiring certain malt properties on which Moore & Schley or
their associates controlled options, and for working capital; and that
a part of the stock so to be issued, to wit, nine million dollars of prefer-
red and four and one-half million dollars of common stock heretofore
underwritten, would be sold upon the terms stated, deliverable when
and if issued. After deducting the stock to be retained by the com-
pany, it was stated that the amount that was to be issued in acquiring
the properties and for working capital was of the par value of $26,250,-
000. The stock to be issued to Eicks for the properties to be acquired
for the corporation was of the par value of $26,240,000—less than stated
in the letter. What was there, then, in this subscription letter to
Moore & Schley which could give the corporation a right of action
against Moore & Schley?

Moore & Schley did not purport to be acting for the corporation to
be organized, nor for those who were to become the purchasers of the
stock; nor was it anywhere alleged that the agreement to purchase the
stock was with the corporation. The promise to purchase was based
upon the statement that the stock was to be issued in acquiring the malt
properties upon which Moore & Schley controlled options, and the sub-
scribers agreed to purchase that stock from Moore & Schley. The
stock which was to be purchased was stock that was to be issued for
the purchase of the malt properties, and the subscribers obtained just
what the letter to Moore & Schley stated they would receive—a portion
of the stock that had been issued to acquire these malt properties.
When the purchasers of the stock had received the stock that they had
purchased they became stockholders in a corporation that had been or-
ganized to acquire certain malt properties for which the corporation
had issued its capital stock of the par value of $26,240,000, and this is
just what the agreement said they were to receive. Certainly the pur-
chase from Moore & Schley of a portion of this stock issued by the
corporation to acquire the malt properties could give the corporation no
cause of action against Moore & Schley or their associates or repre-
sentatives. But Moore & Schley are called "promoters," and it is

claimed that because they are promoters they become in some way liable to the corporation. I do not suppose that calling them promoters itself imposes any liability. It is the relation that in fact existed between the persons upon whom a liability is sought to be imposed and the corporation in whom vests the cause of action which is sought to be enforced that must determine the question as to the liability of the defendants. If, as between the corporation and the individual defendants, a fiduciary relation is established, then, of course, there is imposed upon the agent or trustee the obligations that follow from that relation; but, to establish that liability, the relation must be shown to exist, and there is, as I look at it, no allegation in this complaint that shows that such a relation as between Moore & Schley and the corporation existed. The corporation was organized to acquire these malting properties. It acquired them by issuing its stock to Eicks, and Moore & Schley entered into a contract to sell the stock when issued. Whether Moore & Schley and those associated with them made or lost money would be entirely immaterial so far as rights or obligations of the company were affected. If, by reason of financial disturbances, the subscription to the stock had not been successful, or the subscribers had failed to pay for the stock subscribed for, and the transaction had resulted in a loss, it would not, I assume, be claimed that Moore & Schley could have called on the corporation to make good the loss.

I have not, in expressing my views upon this question, referred to the many cases which were cited on the argument before us. They were all based upon a relation of trust that was shown to exist between the promoter and the corporation or those who subscribed to the capital stock of the corporation. Brewster v. Hatch, 122 N. Y. 349, 25 N. E. 505, 19 Am. St. Rep. 498, is an illustration of the cases in which the relation was established; but in that case it was the subscribers to or purchasers of the stock that sought to hold the persons from whom the stock was purchased as their trustees, not as trustees for the corporation. The plaintiffs were subscribers to the stock of a corporation, and asked for the damages sustained by them on the purchase of the stock. The court, in sustaining a judgment in favor of the plaintiffs, said:

"The end which Brown and his associates sought to and did accomplish, as stated in their testimony, and as found by the court, was the acquisition of the mining property by the corporation to be organized wholly at the cost of such persons as should subscribe and pay for shares to be issued at the rate fixed, and to retain for themselves a majority of the stock without expense or risk. They testified, and the court found, that the purpose was not disclosed to the plaintiffs. The question is, was the relation between these litigants (the purchasers and sellers of the stock) simply vendor and vendees of shares to be issued, or was it one of trust and confidence, binding the defendants to the exercise of good faith and to disclose such information as they possessed affecting the value of the property in which plaintiffs were induced to purchase an interest?"

The prospectus upon which the subscriptions were based stated that the defendants were the trustees who would manage its affairs and receive the subscriptions for stock, and clearly indicated that the defendants, as trustees, were to control and direct such proceedings as should be taken anterior to the formation of the corporation as well as after it; and it was held that the plaintiffs were led to believe, and had a

right to believe, that the defendants were acting in the interest of all the investors, and occupied before the organization of the corporation a position of trust and confidence towards those whom they induced to invest in the enterprise, and that they were liable for the damages sustained by the plaintiffs, who were induced to invest in the shares that were issued.

If the purchasers of the stock of the defendant company had suffered damage by reason of a breach of a trust obligation which existed as between them and the individual defendants, that they would have a cause of action against the defendants cannot be doubted; but that is not this case. The plaintiffs were not subscribers to the stock of the corporation, but purchased it long after it had been issued for property purchased by the corporation. It does not even appear that the stock that they held was a portion of the stock sold by Moore & Schley under the agreement before mentioned. Nor is the cause of action based on a relation of trust between the plaintiffs and the individual defendants. It is the right of the corporation that is sought to be enforced, and the plaintiffs must establish that there was such a relation between the corporation and the individual defendants, and that the defendants violated their duty to the corporation, to entitle the plaintiffs to succeed in this action. No subscriber to this stock has complained of any deception or violation of confidence. The corporation got what it bargained for. All connected with it know of all the facts alleged in the complaint, and neither the corporation nor the subscribers have sought to rescind the transaction.

It is, however, thought that, if what is known as the "English rule" is to be adopted in this state, there is imposed some liability on the defendant. But an examination of the cases in which that rule has been applied discloses that they are but an application of familiar principles, always a part of the common law. Thus, the case of Erlanger v. New Sombrero Phosphate Co., 3 App. Cas. 1219, was brought to rescind a contract of sale made by the promoters to the corporation. The facts undoubtedly justified the rescission, and it was held, in affirming a judgment rescinding the sale to the corporation, that the application to make the promoters account for the profits that they had made by the sale to the company could not be granted; that all the relief that a court of equity could grant was a rescission of the sale. The corporation in that case was organized by the owner of the property which was to be sold to the corporation. The public subscribed to the corporation for its stock, and the proceeds of such subscription were paid to the company, its stock was issued, and such proceeds were paid by the company to the promoters for the property transferred to it. The relations between the corporation and the promoters were entirely different in that case from what they are in this. In this case the stock was actually issued by the company to Eicks for the property, and the stock was sold by him to others.

In Cavendish-Bentinck v. Fenn (1877) 12 App. Cas. 652, the defendant, a director of the Cape Breton Company, was sought to be held liable for a breach of trust as a director of the company. Upon appeal to the House of Lords from a judgment for the defendant, it was held that, as the defendant was interested in the property sold to the cor-

poration, he, being a director, was bound to disclose that interest to the other directors of the company who were entering into a contract for the purchase of property, and his failure to make that disclosure would entitle the company, upon discovering his interest, to rescind the sale; but at the time the action was brought such a rescission had become impossible, and thereupon it was claimed that the defendant had, to make good to the company the loss that they had sustained owing to his misfeasance in failing to make that disclosure. In affirming that judgment, Lord Herschell, in the House of Lords, said:

"Now, I am by no means prepared to say that the argument of the appel-- lant is well founded that such a case as this is a parallel case to the class of cases to which I have alluded, where an agent employed to go into the market and buy at the market price sells his own goods to the company at something above the market price. But I do not think it necessary to come to any absolute determination upon that point, because it is of the very essence of such a case as this to show that the price at which the property was sold to the company was in excess of what has been called the 'real price' or the 'true value.'"

And it was held that, in the absence of evidence to show that the price at which the property was sold to the company was in excess of its true value, there was no such cause of action. And the opinion continues:

"I think it is impossible to arrive at any such conclusion, and to say that, therefore, there has been misfeasance on the part of Mr. Fenn, the present respondent, which would warrant your Lordships coming to the conclusion that he should be compelled to return a part of the money received in respect of this purchase, on the ground that he was making, improperly, a considerable profit. * * * There is no misfeasance in a person who has an interest in the property, by being a shareholder in the company which is selling it, nevertheless acting as a director in the purchase of that property for another company. The misfeasance, if it exists at all, must be in this: that he enters into such a transaction without communicating to his co-directors the fact that he has such an interest. It seems to me that it must rest with those who allege the misfeasance to prove that element, which is an essential element to make out misfeasance at all."

Gluckstein v. Barnes (1900) App. Cas. p. 240, was a case of fraudulent misrepresentation by the defendants as to the price that they had paid for the property which he was about to sell to the company of which he was a director, and the Lord Chancellor, in stating the question, says:

"The simple question is whether four persons, of whom the appellant is one, can be permitted to retain the sums which they have obtained from the company, of which they were directors, by the fraudulent pretense that they had paid £20,000 more than in truth they had paid for the property which they, as a syndicate, had bought by subscription among themselves as directors of the company."

It was determined that fraud was proved, and that the defendants were liable to the company for the damage sustained by the company by reason of the fraud. In that case it was said:

"Indeed, the case is so clear that I do not think it a case of inadequate disclosure, but a direct misrepresentation."

In Burland v. Earle (1902) L. R. App. Cas. p. 83, a case before the Privy Council, in speaking of an action brought by one stockholder to

enforce a demand in favor of the corporation in which he owned stock, it is said:

"The cases in which the minority can maintain such an action are therefore confined to those in which the acts complained of are of a fraudulent character or beyond the powers of the company."

In that case it appeared that at a public sale Burland, one of the directors of the company, had purchased property for $21,000; that he shortly afterwards sold the property to the company for $60,000; that under these circumstances he had been ordered to pay to the company the difference between the purchase price and the price at which he sold it to the company; and, in discussing that question, Lord Davey said:

"Both courts have held that the resale was by Burland's advice and influence, and was made without disclosing to the company the price at which he had purchased. It was also held in the Court of Appeal that Burland had bought the property with the intention and for the purpose of reselling it to the company. * * * But their Lordships do not think it necessary to pursue these topics, because they are of opinion that the relief prayed by the amended statement of claim, and granted in the courts below, is altogether misconceived. There is no evidence whatever of any commission or mandate to Burland to purchase on behalf of the company, or that he was in any sense a trustee for the company, of the purchased property. It may be that he had an intention in his own mind to resell it to the company; but it was an intention which he was at liberty to carry out or abandon at his own will. It may be also that a person of a more refined self-respect and a more generous regard for the company of which he was president would have been disposed to give the company the benefit of his purchase. But their Lordships have not to decide questions of' that character. The sole question is whether he was under any legal obligation to do so. Let it be assumed that the company or the dissentient shareholders might by appropriate proceedings have at one time obtained a decree for rescission of the contract. But that is not the relief which they ask, or could in the circumstances obtain, in this suit. The case seems to their Lordships to be exactly that put by Lord Cairns in Erlanger v. New Sombrero Phosphate Co. (1)."

And Lord Cairns is quoted as follows:

"It may well be that the prevailing idea in their mind was not to retain or work the island, but to sell it again at an increase of price, and very possibly to promote or get up a company to purchase the island for them; but they were, as it seems to me, after their purchase was made, perfectly free to do with the island whatever they liked, or use it as they liked, and to sell it how and to whom and for what price they liked. The part of the case of the respondents which, as an alternative, sought to make the appellants account for the profit which they made on the resale of the property to the respondents, on an allegation that the appellants acted in a fiduciary position at the time they made the contract of August 30, 1871, is not, as I think, capable of being supported."

The principle laid down in these cases does not, it seems to me, support this action. There were no representations in the Moore & Schley letter that the persons who agreed to take this stock were purchasing it from the company. What they agreed to do was to purchase the stock from Moore & Schley, and to pay to the trust company, as agents of Moore & Schley, the price which they agreed to pay for the stock. The further provisions of this agreement clearly show the nature of the undertaking and the obligations assumed by the subscribers. The corporation was to have a capital of $30,000,000, and the agreement stated that "it is expected that of the capital aforesaid all

but two and one-half millions of preferred and one and one-quarter million dollars of common stock to be reserved in the treasury for further corporate uses, will be used in acquiring certain malt properties on which you [Moore & Schley] and your associates control options * * * and for working capital and that a part of the stock so to be issued, to wit: nine million dollars of preferred and four and one-half million dollars of common heretofore underwritten, will be sold upon the terms above stated, deliverable when and if issued." The whole agreement shows that this was a sale of stock by Moore & Schley, which was to be acquired by them after its issue by the corporation for the purchase of these malting properties upon which Moore & Schley had options. It clearly contemplated that before the stock was to be delivered under this agreement the company should be organized, the stock issued and acquired by Moore & Schley, and delivered by them to the signers of this agreement. The signers of the agreement made no contract with the company, and there is here nothing that gives to the corporation the right to compel Moore & Schley to accept less for their options, and the property that they secured for the corporation under the options, than the corporation had agreed to pay for the properties. Nor have the corporation, or its stockholders, or the purchasers of the stock asked to rescind the purchase. This suit is, in effect, one to compel the vendors (Moore & Schley) to return a part of the consideration that the corporation had paid for these properties which it had purchased, upon the ground that the vendors made a profit out of their contract with the corporation—a claim which, in all the English cases to which I have called attention, it had been held could not be enforced. If we assume that the persons purchasing stock of Moore & Schley under this agreement would have had a right of rescission or a right of action against Moore & Schley to recover the damages sustained by them because of any false representation as to their relations to the property or to the company, that would give no cause of action to the company, nor would a settlement with the company by Moore & Schley have satisfied any cause of action which had existed, in the subscribers to this agreement, either to rescind their purchase of the stock, or to claim from Moore & Schley any damage that they had sustained by its purchase. It is the subscribers to this agreement who would be injured by any misrepresentations or suppressions contained in the instrument. They would have their cause of action against Moore & Schley; and to hold Moore & Schley also liable to the company would be to impose an obligation upon them for statements made, not to the company, or for the purpose of inducing or which did induce any corporate action, but made to subscribers to an agreement to purchase stock of the company. The liability to the corporation must depend upon the violation of a trust relation in which Moore & Schley stood to it. As was said by the Court of Appeals in Seymour v. S. F. C. Ass'n, 144 N. Y. 333, 39 N. E. 365, 26 L. R. A. 859:

"But in every class of cases the rule is founded upon the unwillingness of the law to uphold contracts which bring into collision the trust duty and the personal interest. * * * The entire basis of the rule consists in this collision between trust duty and personal interest, and the equitable prohibition has no application when there is no possible inconsistency."

I think this distinction is recognized in all the authorities. Parsons v. Hayes, 50 N. Y. Super. Ct. 29; Home Fire Ins. Co. v. Barber (Neb.) 93 N. W. 1024, 60 L. R. A. 927; Tompkins v. Sperry, Jones & Co., 96 Md. 560, 54 Atl. 254. As before stated, neither the corporation nor the subscribers to this agreement have at any time offered to rescind the transaction, nor is this suit brought to enforce a right of rescission, and I do not think that there are any facts alleged which show a violation by these individual defendants of any duty reposing in trust and confidence to the corporation that they have violated which authorizes the corporation to call upon them to account for their acts.

It follows, therefore, that the judgment must be reversed, with costs, and the demurrer sustained, with costs, with leave to the plaintiff to amend on payment of costs in this court and in the court below.

PATTERSON, J. I am unable to concur in the opinion of Mr. Justice HATCH, and my judgment in this case inclines me to concur in the result reached by Mr. Justice INGRAHAM.

It seems to me that the radical defect in the plaintiffs' case is that they do not show themselves to be entitled, either originally or derivatively, to the relief they demand. Taking the allegations of the complaint reciting facts, and separating them from mere characterizations and conclusions, it seems to me to be apparent that there can be no cause of action inhering in the plaintiffs, unless one inhered in the corporation. I do not see how a right to maintain this action resided in the corporation. Suggestions, charges, epithets, and imputations in the complaint must all yield, as I view the case, to the contents of Exhibit A (annexed to the complaint), which only constitutes, between the signatories to that paper and Moore & Schley, a private contract that the former would take the number of shares set opposite to their several signatures of preferred stock and of common stock in a corporation to be organized to manufacture and deal in malt, with a capital of thirty millions of dollars, out of which capital all but two and a half millions of preferred and one and a quarter millions of common stock, to be reserved for future corporate uses, would be applied to acquiring malt properties of which Moore & Schley controlled options (or their value, as Moore & Schley might determine, in lieu of any thereof that might not be acquired), and that the stock so to be issued, namely, nine millions of dollars of preferred and four and a quarter of common stock, would be sold upon the terms above stated, deliverable when issued. What would be understood by this private contract entered into between Moore & Schley and those who signed it? As soon as it was put out by Moore & Schley and they invited responses, those who signed the paper knew precisely what they undertook in the way of an obligation. When they signed, they did not agree with a corporation, but they agreed to take from Moore & Schley, when a corporation should be formed, the number of shares set opposite their names respectively, and they agreed as to what and how much stock should be issued for the options. It seems to me that this is a simple contract by which Moore & Schley agreed to furnish shares of stock in respect of which those agreeing to take knew fully what the capitaliza-

-tion was to be, and what would be paid in stock to get in the main
-properties, which could be acquired only through the options which
were held or controlled by Moore & Schley. There is no false rep-
-resentation, and there is no suppression of fact. It is a mere char-
acterization to say that Moore & Schley made an unlawful secret
profit out of a situation which it is not shown they were bound to dis-
-close to the signers of Exhibit A.

I fully concur with Judge HATCH in the abstract rules of law
-which he has stated, and in the very admirable and learned classifica-
tion and array he has made of the cases bearing upon the subject
-of the liability of a promoter of a corporation. I see no reason to
dissent from anything he has said on that general matter, and I re-
gard his opinion in that respect as a very useful and valuable contri-
-bution to the literature of that subject. But I cannot bring this case
-within any one of his classifications. My view is that the corpora-
-tion which was organized had no right of action against Moore &
-Schley, and that hence these plaintiffs, as stockholders, derive no
right of action from that company. If a wrong has been done, it is
-one to be remedied in favor of those who signed Exhibit A, or those
-claiming directly under them, and there is no complaint emanating
-from them.

For-these reasons, I think the demurrer should have been sus-
tained, and, as a consequence, I concur in the conclusion reached by
Mr. Justice INGRAHAM.