JAMES D. BREWSTER et al., Appellants, *v.* WALTER T. HATCH et al., Respondents.

Defendant B. having acquired, in his own name, but for the joint benefit of himself and the other individual defendants herein, options, giving a right to purchase certain mining property, entered with them into a contract, by the terms of which it was agreed to issue a prospectus and invite subscriptions for the stock of a corporation which it was proposed to organize, in case subscriptions were obtained sufficient to pay for the property; in which case the purchase was to be made and title taken by B. for himself and as trustee for his associates; he to convey to the corporation, receiving therefor the whole capital stock. All that remained of said stock, after delivery to the subscribers, was to be divided between the contracting parties in specified proportions. A prospectus and subscription paper were accordingly issued; the former set forth the terms and conditions upon which the corporation was proposed to be organized, and in it the names of the associates were given as the officers and trustees of the corporation. In the subscription paper H., one of the associates, was named as trustee for the subscribers. The capital stock of the proposed corporation was fixed at $1,500,000, divided into shares of the par value of $10 each. The prospectus stated that only a portion of the shares were to be sold at $4 per share; they were to be fully paid up and non-assessable. Subscriptions having been received from plaintiffs and others for about 61,000 shares at the prices agreed upon, the cor-

poration was organized. The associates, who had performed or directed everything that was done previous to the incorporation, signed the necessary certificate therefor, naming themselves as trustees for the first year. B. thereupon completed the purchase of the property, received a deed, and immediately conveyed to the corporation; all the stock was thereupon issued to him; he assigned the shares subscribed for to the purchasers and applied the money in payment of a loan made to him and his associates to make the purchase. After paying the cost of the purchase and other expenses, the associates had remaining on hand 58,235 shares of stock, for which they paid nothing, and which were divided between them as provided in their contract. Plaintiffs, when they received and paid for their stock, had no knowledge of the contract or notice that defendants were to acquire shares without paying for them. In an action to recover damages, *held,* that plaintiffs had the right and were led to believe, from the documents and circumstances, that defendants were acting in the interest of all the investors, and defendants knew that plaintiffs so believed; and so that the relation between the parties was not that of vendors and vendees simply, but was one of trust and confidence, binding defendants to the exercise of good faith, and to disclose the information they possessed affecting the value of the property; and that plaintiffs were entitled to recover.

(Argued June 13, 1890; decided October 14, 1890.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made December 31, 1886, which affirmed a judgment in favor of defendants entered upon a decision of the court on trial at Special Term.

This action was brought to recover for the corporation the value of its shares distributed among the defendants, without cost to them, or to obtain such other or further relief as should be found just and agreeable to equity. On the trial the court required the plaintiffs to elect whether they would seek to recover for the benefit of the corporation or to recover their personal damages, and they elected to demana the last-mentioned relief.

In January, 1879, Martin B. Hayes held options for the purchase of the Dunderberg and Sub-treasury mines, in the state of Colorado, which, by their terms, were to expire on the thirty-first of that month. On the thirtieth of January the

defendants and Hubbard H. Duncklee, the intestate of Mary C. Duncklee, acquired an interest in the options, and paid $5,000 to have them extended for four months, and thereupon entered into the following contract:

"This agreement, made and entered into this 30th day of January, 1879, between Walter T. Hatch, J. Warren Brown, C. E. Quincey, Emory Thayer and H. H. Duncklee, all of the City and State of New York, and Stephen B. Elkins, of Sante Fe, New Mexico;

"WHEREAS, the owners of the Dunderberg and Sub-treasury mines, situated in the county of Clear Creek, State of Colorado, are willing to sell the same for the sum of one hundred and thirty-five thousand ($135,000) dollars, and are further willing for the sum of five thousand ($5,000) dollars, to be. paid in cash as a forfeit, to deposit their deed to said mines in escrow in the City National Bank of Denver, with orders to said bank on the payment of said purchase-price at any time within four months from the date hereof to deliver said deeds to the purchaser,

"Now, this agreement witnesseth that the parties hereto have mutually agreed to and with each other as follows:

"*First.* The interest of the parties in this agreement shall be as follows: The said H. H. Duncklee shall be entitled to one-tenth (1-10), and the remaining parties hereto to nine-tenths (9-10) in equal proportions, that is to say, the said H. H. Duncklee shall be entitled to five-fiftieths (5-50), and the remaining parties hereto to nine-fiftieths (9-50) each, and in this proportion the parties hereto, respectively, shall share in all the expenses, losses and profits arising under this agreement.

"*Second.* They will pay said five thousand ($5,000) dollars forfeit to the owners of said mines for the privilege of purchasing the same within four months at the price named.

"*Third.* That as soon as the parties hereto shall be reasonably satisfied that said mines are valuable and as they have been represented, they will issue a prospectus reciting the history of said mines, their character, richness, quantity and quality of ore, together with a schedule of sales and price of

ore heretofore produced, with such other information and such reports as they may deem proper.

"*Fourth.* Upon being satisfied that they can obtain subscriptions sufficient to purchase said mines, and enough, if the parties should so determine, to cancel the existing leases thereon, they will then incorporate and organize a company, under the laws of the State of New York, to be called the Dunderberg Mining Company, with a capital of one million ($1,000,000) dollars, to be divided into one hundred thousand shares at ten ($10) dollars per share, the same to be fully paid up and non-assessable. The object of said company will be to purchase, hold, work and operate gold, silver, lead, copper and other mines in the State of Colorado or elsewhere. That of the capital stock of said company there shall be given to Martin B. Hayes, of Denver, Colorado, six thousand (6,000) shares upon the conditions hereinafter stated, and of the remaining ninety-four thousand (94,000) shares there shall be sold at such price per share as the parties hereto may agree upon, a sufficient number to purchase said mines. And if the parties should determine and agree thereupon an additional number sufficient to cancel the existing leases thereon. And the remaining shares, whatever the number may be, shall be divided between the parties hereto, and held without cost to them, according to their respective interests in this agreement as defined in section one thereof, unless they should determine to sell for their joint benefit a portion of said remaining shares. That the six thousand (6,000) shares of the capital stock to be given to said Hayes shall be as compensation for his aiding the parties hereto in securing the option on said mines for four months, and that he will co-operate with them and use his best efforts to aid them in soliciting subscriptions to the stock at the price fixed by the parties hereto, and promote the success of the company to be organized, and that he will not sell or dispose of his stock at a price lower than the subscription price of said stock, and the said six thousand (6,000) shares shall be issued only upon said Hayes binding himself by a suitable agreement in writing to perform these conditions.

"*Fifth.* In the event the parties hereto should fail, within the four months named, to sell shares sufficient to pay for said mines and the existing leases thereon, if they should determine to cancel the same, then and in that event they agree and bind themselves to each to pay his share of all the expenses incurred, and this agreement shall thereafter cease and determine.

"*Sixth.* It is further agreed that the parties shall incur no expense, not actually necessary, and then not without the consent of all the parties hereto.

"*Seventh.* That for the purpose of taking the deeds in escrow and doing all matters necessary to be done in the matter of procuring the same and transacting the business at the mines and in Colorado, the said J. Warren Brown shall act as the trustee of the parties hereto, and when required will make the deeds to the company to be organized as aforesaid when his trust shall cease and determine.

"*Eighth.* That for the purpose of receiving subscriptions for stock, giving receipts and transacting all financial business of the parties in the premises, they shall select from their number a trustee, who shall act for them.

"*Ninth.* That the parties hereto may change or alter this agreement at their pleasure, all agreeing and consenting to such change or alteration.

" *Witness* our hands and seals this the first day of February, A. D. 1879.

| "(Signed.) | J. WARREN BROWN, | [SEAL.] |
| | " WALTER T. HATCH, | [SEAL.] |
| | " C. E. QUINCEY, | [SEAL.] |
| | "EMORY THAYER, | [SEAL.] |
| | " H. H. DUNCKLEE, | [SEAL.] |
| | " S. B. ELKINS, | [SEAL.] " |

After an examination of the mines and the titles of the proposed vendors, the defendants decided that the titles were not satisfactory and that the purchase should not be made, and the sum paid for the extension of the contracts was forfeited and the options canceled. Afterwards negotiations were

opened with the rival claimants to these and other mines, and options secured from them, the terms of which do not appear. The defendants then agreed that the written contract entered into between them February 1, 1879, should be modified by providing that the nominal capital of the corporation to be organized should consist of 150,000 shares of $10 each, and that Martin B. Hayes should have no interest in the venture, and, as so modified, it should be binding upon the signers thereto, and applicable to the new options secured. It was also agreed that J. Warren Brown should acquire the title to the property and convey it to the corporation to be formed, and receive in payment its capital stock. They also agreed to offer a part of the shares so to be issued to Brown, for $4 per share, for the purpose of reimbursing themselves for their expenditures in acquiring the property. To carry out this purpose, they issued a prospectus, and put forth a subscription, of which the following are copies :

" PROSPECTUS OF THE DUNDERBERG MINING COMPANY.

" The property to be conveyed to the Dunderberg Mining Company, when fully organized, consists of the following lode claims :

| | | |
|---|---|---|
| " Dunderberg Lode | 3,000 | feet. |
| " East Terrible " | 500 | " |
| " Sub-Treasury " | 1,500 | " |
| " Silver Chain " | 1,500 | " |
| " Muldoon " | 700 | " |
| " Elephant " | 700 | " |

" All situate near Georgetown, Clear Creek County, Colorado.

" The Dunderberg Mining Company is now being organized under the Laws of the State of New York, with a capital stock of $1,500,000, divided into 150,000 shares of ten dollars each, only a portion of which is offered for sale, at four dollars per share.

" The product on 300 feet of the Dunderberg Mine alone, the past year, was over $300,000, which is more than one and a half per cent a month on the par value of the stock, and

about four per cent a month on the investment. There can be no doubt that this yield will be continued, and even greatly increased as the workings are extended. Competent experts estimate the mineral in the unworked ground already developed at over $1,500,000, which is not one-tenth part of the ground undeveloped above water line within the present workings.

" Among the Officers and Trustees who will manage its affairs, and who will receive subscriptions for stock, may be mentioned :

" Walter T. Hatch, of W. T. Hatch & Sons, 34 Wall Street.

" J. Warren Brown, 62 Broadway.

" S. B. Elkins, Hotel Bristol, 42d St. and 5th Av.

" Charles E. Quincey, of Heath & Co., 19 Broad Street

" Emory Thayer, 547 Broadway.

" H. H. Duncklee, 62 Broadway.

" The stock is to be fully paid and non-assessable. No money is needed for development, as the mines are open and producing sufficient ore to insure regular dividends on the stock.

" It is proposed by the management to work these properties upon an economical basis, and to create out of the earnings, beyond regular monthly dividends, a surplus to be invested in United States Bonds. The principal office will be in the City of New York, where all reports, and maps showing the works, and books will be open to the examination and inspection of the stockholders.

" The Dunderberg and Terrible Veins are among the best known and most popular mines in Colorado — the universal report being that they are well defined, constant and permanent fissure veins.

" The reports from experts of high character, the actual sales of ores since the mines have been opened, and their known reputation, enable the owners to confidently commend the investment to the public as safe, remunerative and permanent.

" Plan of organization, maps of the property, specimens of ore from the various workings, and authenticated statements of ores sold up to March 1st, 1879, and full and detailed

reports by the mining engineers and experts who were employed to examine the properties prior to the purchase, may be seen at the office of J. Warren Brown, 62 Broadway.

"The following reports made after personal examination by their authors, who are known both in this country and Europe as among the most reliable and competent authorities upon mining matters, are respectfully submitted."

Annexed to this prospectus were favorable letters and reports from mining engineers.

"SUBSCRIPTION AGREEMENT.

"WHEREAS, A corporation is about to be organized under the laws of the State of New York, to be called the Dunderberg Mining Company, for the purpose, among other things, of acquiring title to the following mining properties, known as the Dunderberg, Sub-treasury, Silver Chain, Muldoon and Elephant mines or lodes, and a part of the Terrible mine or lode, all situate in Clear Creek county, State of Colorado.

"And WHEREAS, The capital stock of said company is to be divided into 150,000 shares, of the par value of ten dollars per share, and all of said stock to be issued to J. Warren Brown in payment for said mines,

"*Now*, in consideration of the transfer to us of the several numbers of shares set opposite our names respectively hereunto subscribed, we do covenant and agree with the said J. Warren Brown that we will accept and receive such stock and pay for the same at the rate of four dollars per share. And for the purpose of carrying out this agreement, we hereby agree to pay to Walter T. Hatch, of 34 Wall street, New York, as trustee for us, on demand, the aforesaid sums of money so subscribed by us to be held by the said trustee for us, and paid over by him to the said J. Warren Brown upon the delivery to the Dunderberg Mining Company of a deed or deeds for the mines and mining properties above named, and the receipt from said J. Warren Brown of the several numbers of the shares of stock subscribed by us respectively, and not otherwise.

"Dated New York city, March 10th, 1879."

Before the corporation was organized Brown and his associates sold about 61,000 shares, the plaintiffs being purchasers of some of them, for four dollars per share, which was paid in to Walter T. Hatch, and by him deposited to his credit, as trustee, with the banking firm of W. T. Hatch & Sons. After the plaintiffs and others had subscribed, Brown and his associates, May 7, 1879, procured the Dunderberg Mining Company to be incorporated under chapter 40 of the Laws of 1848 of this state, they all becoming trustees for the first year. Subsequently, but before Brown took the title to the mining properties, the plaintiffs paid for the shares for which they subscribed; on the 31st of May, 1879, Brown completed the purchase, and on the same day the title was transferred to him by the vendors, and by him transferred to the corporation, and 150,000 shares of stock were issued to him. Immediately afterwards he assigned the number of shares purchased by the subscribers to them, and Hatch applied the money in payment of the loan made May 31, 1879, to Brown by his associates to enable him to complete the contract of purchase. The mining properties cost the defendants about $242,000; after distributing the shares sold at four dollars each, and those distributed to brokers and others to advance the scheme, the defendants had remaining on hand 58,235 shares for which they paid nothing. The plaintiffs had no knowledge of the contract entered into between Brown and his associates, nor any notice that the defendants were to acquire shares without paying for them.

*William B. Hornblower* for appellants. The defendants Brown, Elkins, Quincey, Thayer and Duncklee, constituted themselves promoters of the defendant corporation. (*Twycross* v. *Grant*, L. R. [2 C. P. Div.] 503; Morawetz on Corp. § 545; *W. B. & C. Co.* v. *Green*, L. R. [5 Q. B. Div.] 109, 111.) These defendants having formed a syndicate for the promotion of the defendant corporation, sustained a fiduciary relation to the corporation and to the individual stockholders upon the faith of whose subscriptions its organization was

effected. (*N. S. P. Co.* v. *Erlanger*, L. R. [5 Ch. Div.] 73; L. R. [3 App. Cas.] 1218; *Chandler* v. *Bacon*, 30 Fed. Rep. 538; Thomp. on Corp. 218; *Bagnall* v. *Carlton*, L. R. [6 Ch. Div.] 386.) This fiduciary relation characterized all the transactions of the syndicate including the organization of the corporation, the soliciting of subscriptions to effect the purchase of its plant and the allotment of shares to the subscribers. (*L. P. Co.* v. *Hurd*, L. R. [5 P. C. App.] 221; *Hichens* v. *Congreve*, 1 R. & M. 150; *Simons* v. *V. O. Co.*, 61 Penn. St. 202; *L. M. Co.* v. *Brooks*, L. R. [35 Ch. Div.] 400; *Getty* v. *Devlin*, 54 N. Y. 403; *Beck* v. *Kantorowicz*, 3 K. & J. 230; *Chandler* v. *Bacon*, 30 Fed. Rep. 538.) The plaintiffs and others in like case, by means of whose subscriptions the organization of the company was effected and its property purchased, were associated with these defendants in a common enterprise, and were parties to the fiduciary relation assumed by the syndicate. (*S. B. Co.* v. *Crawford*, 4 R. & C. L. J. 190; Pom. Eq. Juris. § 370; Morawetz on Corp. § 293; *Simons* v. *V. O. Co.*, 61 Penn. St. 202; *Society* v. *Abbott*, 2 Beav. 559; *Getty* v. *Devlin*, 54 N. Y. 403.) These defendants were bound to disclose to the plaintiffs and other subscribers in like case, the syndicate agreement, and are accountable for the secret profits which they derived from the organization of the company. (*Bagnall* v. *Carlton*, L. R. [6 Ch. Div.] 686; *Chandler* v. *Bacon*, 30 Fed. Rep. 538; *Getty* v. *Devlin*, 54 N. Y. 403; *Simmons* v. *Vulcan Co.*, 61 Penn. St. 202; *Beck* v. *Kantorowicz*, 3 K. & J. 230; 10 Abb. [N. C.] 401.) This suit is properly brought on behalf of the plaintiffs and all other shareholders in like case. (*Robinson* v. *Smith*, 3 Paige, 222; *Health* v. *Erie*, 8 Blatch. 347; *Getty* v. *Devlin*, 54 N. Y. 403; *Atwood* v. *Merryweather*, L. R. [5 Eq. Div.] 464; Perry on Trusts, § 27; Code Civ. Pro. § 448; Story's Eq. Pl. § 97; 1 Daniell's Ch. Pr. & Pl. 231, 232; *Weld* v. *Bonnham*, 2 S. & S. 91; *McKenzie* v. *L'Amoureaux*, 11 Barb. 516; *Wood* v. *Draper*, 4 Abb. Pr. 322; *Milhau* v. *Sharp*, 15 Barb. 193; *Hichens* v. *Congreve*, 1 R. & M. 105; *Prouty* v. *M. S. R. R. Co.*, 1 Hun, 655; *Brown* v. *B. N. Y.*, etc.,

*R. R. Co.*, 27 id. 342.)   The court erred in excluding evidence as to the state of mind of the plaintiffs.  (*Hurdt* v. *Schulting*, 13 Hun, 537 ; *More* v. *Devoe*, 22 id. 210, 223 ; *West* v. *F. N. Bank*, 20 id. 408 ; *D. C. M. Ins. Co.* v. *Hachfield*, 73 N. Y. 226, 229.)   As the facts are substantially undisputed, and a second trial cannot alter the result, the court should not only reverse the judgment appealed from, but should order a judgment for the plaintiffs in the nature of an interlocutory judgment for an accounting. (*Edmonston* v. *McLoud*, 16 N. Y. 543 ; *Beach* v. *Cooke*, 28 id. 508 ; *Marquat* v. *Marquat*, 12 id. 336 ; *Muldoon* v. *Pitt*, 54 id. 274.)

*William G. Choate* for respondents.   The issue of stock in excess of the actual value of property, though it be a violation of statute and may subject a corporation to the loss of its charter, does not make the directors or officers liable for the difference between the nominal value of the stock and the value of the property, either at the suit of the corporation, or of stockholders.  (*Parsons* v. *Hayes*, 14 Abb. [N. C.] 419 ; *Langdon* v. *Fogg*, 18 Fed. Rep. 5 ; *Foster* v. *Seymour*, 23 id. 66 ; *Christensen* v. *Eno*, 106 N. Y. 97.)

FOLLETT, Ch. J.   The end which Brown and his associates sought to and did accomplish, as stated in their testimony, and as found by the court, was the acquisition of the mining property by the corporation to be organized, wholly at the cost of such persons as should subscribe and pay for shares to be issued at the rate fixed, and to retain for themselves a majority of the stock without expense or risk.   They testified and the court found that their purpose was not disclosed to the plaintiffs.  . The question is, was the relation between these litigants simply that of vendors and vendees of shares to be issued, or was it one of trust and confidence, binding the defendants to the exercise of good faith and to disclose such information as they possessed affecting the value of the property in which the plaintiffs were induced to purchase an interest?   The learned counsel for the respective parties substantially agree

on the rule of law governing the rights of the parties. They agree that if the plaintiffs were simply the vendees of the defendants, that the action cannot be maintained ; but if the defendants stood in a fiduciary relation to the plaintiffs, a liability exists. The true relation existing between these parties must be sought for in the contracts found by the court to have been entered into, in the prospectus which the defend. ants put forth and in the circumstances involved in the trans. action. When the plaintiffs subscribed for their shares there was no corporation in existence. Brown had acquired for himself and his associates the right to purchase the mining properties within a given time at prices agreed upon. These options ran to Brown, but he was acting in the interests of his associates, and the legal relation of the defendants is not different from what it would have been had the contracts stood in their own names. Brown and his associates were under no obligation to purchase and pay for the mines, and their loss, if they did not, would be measured by the amount paid for the options and such expenses as might be incurred. This being the situation, the defendants fixed the terms and conditions upon which the corporation should be organized. They devised and put forth the subscription paper and prospectus, stating in the paper last mentioned that : "Among the officers and trustees who will manage its affairs and who will receive subscriptions for stock, may be mentioned Walter T. Hatch, of W. T. Hatch & Sons, 34 Wall street; J. Warren Brown, 62 Broadway ; S. B. Elkins, Hotel Bristol, Forty-second street and Fifth avenue; Charles E. Quincey, of Heath & Co., 19 Broad street; Emory Thayer, 547 Broadway; H. H. Duncklee, 62 Broadway." It is recited in the prospectus and in the subscription paper that the corporation was thereafter to be organized for the purpose of acquiring title to mines, which were specified. The plaintiffs did not subscribe for shares then in existence, but for shares to be thereafter created by the defendants, and it is certain that it must have been understood by the plaintiffs and those similarly situated, that the defendants were to carry forward the enterprise, acquire the

property, organize the corporation and to generally protect the interests of those who should join in furnishing the money to pay for the property. The documents clearly indicate that the defendants, as trustees, were to control and direct such proceedings as should be taken anterior to the formation of the corporation, as well as after. The prospectus so states, and they actually performed or directed everything that was done preliminarily to the organization, when these defendants, and they only, executed the certificate by which the corporation was brought into existence, making themselves trustees for the first year. In the subscription paper Mr. Hatch is called the trustee of the subscribers, and so he was, but he was one of the promoters, jointly interested with them, and all are as responsible for his acts as though all had been named as trustees for the subscribers. As against these facts it is urged that it being stated in the subscription that the mines were to be capitalized at $1,500,000, to be divided into shares of the par value of $10 each, to be issued to Brown in payment for the mines; and in the prospectus that only a portion of the shares are offered for sale at $4 per share, and that the stock is to be fully paid up, and non-assessable, was a distinct notice to the plaintiffs of how the corporation was to be set on foot, and that they and the defendants were dealing solely as vendors and vendees. These papers read in the light of the purpose of the defendants, as disclosed by their evidence, seem to have been devised to cover the underlying scheme by which the corporation was to be organized, largely for the benefit of the promoters, but wholly at the risk and expense of the subscribers. We do not think that the inference contended for by the defendants can be justly drawn from the meager disclosures which they made in the documents put forth. They knew that they, and they only, absolutely controlled the scheme, and were to determine whether it should be carried out, and if so, when and how. We think that the plaintiffs were led to believe, and had the right to believe, from the documents and from the circumstances that the defendants were acting in the interests of all of the investors, and that they knew that the

plaintiffs so believed. These defendants were the promoters of the corporation and occupied, before its organization, a position of trust and confidence towards those whom they induced to invest in the enterprise. (*Getty* v. *Devlin,* 54 N. Y. 403; 70 id. 504; *Erlanger* v. *N. S. P. Co.,* L. R. [3 App. Cas.] 1218; *Simons* v. *V. O. Co.,* 61 Penn. St. 202; *Twycross* v. *Grant,* L. R. [2 C. P. Div.] 503; *W. B. C. P. Co.* v. *Green,* L. R. [5 Q. B. Div.] 109; Morawetz on Corp. § 545; Cook's S. & S. § 651; Thomp. on Liab. of O. & A. 218, § 20.) It is conceded and found by the court that the defendants did not disclose the amount which they were to pay for the mines, or the fact that they did not intend to exercise their options, unless sufficient funds were furnished by others to pay for the property and all of the expenses of organizing the corporation, leaving for distribution among themselves a majority of the stock. It is clear, we think, that if the defendants had avowed their purpose, the plaintiffs would not have taken an interest in the enterprise, and that they are liable for the damages sustained by the plaintiffs who were induced to invest in shares to be issued.

The judgment should be reversed and a new trial granted, with costs to abide the event.

All concur.

Judgment reversed.