LEIGHTON v. LEIGHTON LEA ASS'N et al.

(Supreme Court, Special Term, Monroe County. March 18, 1910.)

1. BUILDING AND LOAN ASSOCIATIONS (§ 42*)—STOCKHOLDERS—STATUTORY LIABILITY.

Where an action on a 30-day note made by a building association incorporated under Laws 1851, c. 122, was not commenced against the association until more than 2 years after the maturity of the note, the stockholders of the association were not liable under section 11, making stockholders liable to creditors to the amount of the stock held by them for the debt created by the note.

[Ed. Note.—For other cases, see Building and Loan Associations, Dec. Dig. § 42.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. BUILDING AND LOAN ASSOCIATIONS (§ 42*)—STOCKHOLDERS—LIABILITY.

A holder of an unsatisfied judgment against an insolvent building association incorporated under Laws 1851, c. 122, for a deficiency on a mortgage foreclosure, and of an unsatisfied judgment on a note made by the association, may enforce any claim or right of action which the association has against its stockholders for unpaid stock subscriptions.

[Ed. Note.—For other cases, see Building and Loan Associations, Dec. Dig. § 42.*]

3. BUILDING AND LOAN ASSOCIATIONS (§ 42*)—STOCKHOLDERS—LIABILITY.

A building association incorporated under Laws 1851, c. 122, planned to purchase a tract, to divide into 200 lots, and to make the stock consist of 200 shares of $600 per share. An owner conveyed 40 acres to a third person, who conveyed 200 lots thereof to the association, and retained the balance. The association paid the owner $10,000, executed a mortgage to him for $60,000, and a mortgage for $50,000 to the third person. It was claimed that the mortgage to the third person was held for the benefit of syndicate members who claimed that they were entitled to share with the third person in the land withheld by him from the association, while the association claimed that the third person's purchase was held for the association. The dispute was settled, and under the settlement each syndicate member received a credit of $612 on his stock subscription, of which sum $12 represented interest and $300 represented what each member had paid in cash, and $300 was credited to each member in consideration of the cancellation of the $50,000 mortgage and the conveyance of the land withheld to the association. The settlement was made in good faith. *Held*, that the settlement was supported by a valid consideration and the credit of $300 to each syndicate member was valid as to all creditors of the association.

[Ed. Note.—For other cases, see Building and Loan Associations, Dec. Dig. § 42.*]

4. BUILDING AND LOAN ASSOCIATIONS (§ 42*)—STOCKHOLDERS—LIABILITY.

Where a building association organized under Laws 1851, c. 122, exercised its option under its articles of association, and declared the rights of defaulting subscribers forfeited, and kept the money paid in by such subscribers, and the lots representing the shares forfeited were sold by the association, or were sold under foreclosure of a mortgage given by the association, the stockholders were not, in the absence of fraud, liable to the creditors of the association for their unpaid stock subscriptions.

[Ed. Note.—For other cases, see Building and Loan Associations, Dec. Dig. § 42.*]

5. BUILDING AND LOAN ASSOCIATIONS (§ 42*)—STOCKHOLDERS—LIABILITY.

Where stockholders of a building association stopped paying their dues without any default on the part of the association or stopped payment, when they ascertained that the association could not give them a clear title to their lots, because they did not have sufficient money to pay a mortgage on the tract purchased by it to make the requisite payment to secure a release of the lots, but the rights of the stockholders were not forfeited by the association, a judgment creditor of the association could insist on the payment of the balance due on the stock subscriptions, unless the claim of the association thereto was barred by limitations.

[Ed. Note.—For other cases, see Building and Loan Associations, Dec. Dig. § 42.*]

6. BUILDING AND LOAN ASSOCIATIONS (§ 42*)—PAYMENT OF CAPITAL STOCK—EXCUSE.

The inability of a member of a building association incorporated under Laws 1851, c. 122, to obtain a lot according to the plan of the association, does not relieve him from liability to pay for his stock where the association has become insolvent.

[Ed. Note.—For other cases, see Building and Loan Associations, Dec. Dig. § 42.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

**7. LIMITATION OF ACTIONS (§ 46*)—CONTRACTS—STOCKHOLDERS' LIABILITY.**

A judgment creditor of an insolvent building association incorporated under Laws 1851, c. 122, cannot recover on unpaid stock subscriptions against subscribers who plead the statute of limitations, unless some payment on the subscriptions has been made within six years prior to the commencement of the action, since the creditor's right of action against the stockholders is purely representative, founded on the contract of subscriptions, and not arising under any statute.

[Ed. Note.—For other cases, see Limitation of Actions, Dec. Dig. § 46.*]

**8. LIMITATION OF ACTIONS (§ 51*)—STOCKHOLDERS' LIABILITY—LIMITATIONS.**

Where dues were payable to a building association at periods stated in the articles of association, so that the association, without any call for payment, could sue for each installment as it fell due, the right to sue for dues was barred in six years after last payment of dues.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 280–284; Dec. Dig. § 51.*]

**9. BUILDING AND LOAN ASSOCIATIONS (§ 32*)—LIABILITY OF STOCKHOLDERS—INTEREST.**

Under the constitution of a building association adopted May 11, 1893, which provided for the payment of weekly dues of $2 on each share as from March 1, 1893, until July 1, 1893, and of weekly dues thereafter of 40 cents on $100 of the appraised valuation of the lot allotted to the stockholders, "with interest on all sums remaining unpaid on said lot * * * computed semiannually," the first installment of interest fell due January 1, 1894, to be computed on the amounts remaining unpaid, and where the association charged each subscriber at the end of the period with six months' interest on the entire amount unpaid at the beginning of the period, and added the interest to the amount, and then subtracted the intervening payments and reckoned interest for the next six months on the balance as a new principal, the method of computing interest was as favorable as any one could ask.

[Ed. Note.—For other cases, see Building and Loan Associations, Dec. Dig. § 32.*]

**10. BUILDING AND LOAN ASSOCIATIONS (§ 32*)—LIABILITY OF STOCKHOLDERS—INTEREST.**

Under the constitution of a building association, providing for payment of weekly dues with interest on all sums remaining unpaid computed semiannually, the association is not entitled to interest upon interest, where no intervening payments were made during a six-month period.

[Ed. Note.—For other cases, see Building and Loan Associations, Cent. Dig. §§ 48–59; Dec. Dig. § 32.*]

**11. INTEREST (§ 26*)—RIGHT TO INTEREST—WAIVER.**

Where installments of interest are due as part of the payments contracted for, a subsequent payment of the principal does not waive interest previously accrued.

[Ed. Note.—For other cases, see Interest, Cent. Dig. §§ 7–10; Dec. Dig. § 26.*]

**12. INTEREST (§ 17*)—RIGHT TO INTEREST.**

Where installments of interest are due as part of the payments contracted for, interest cannot be compelled on interest contracted for.

[Ed. Note.—For other cases, see Interest, Cent. Dig. § 30; Dec. Dig. § 17.*]

**13. BUILDING AND LOAN ASSOCIATIONS (§ 42*)—LIABILITY OF STOCKHOLDERS—LACHES.**

Where transactions between a building association and its members could not be impeached on the ground of bad faith, and, by reason of lapse of time, it was impossible to restore the parties to their original positions, and the association probably gained more than it lost by the transactions,

a judgment creditor of the association could not invalidate the transactions, and charge the members with liability as if the transactions had not been had.

[Ed. Note.—For other cases, see Building and Loan Associations, Dec. Dig. § 42.*]

14. BUILDING AND LOAN ASSOCIATIONS (§ 17*) — OBLIGATION TO PAY DUES — STATUTES.

The obligation of members of a building association organized under Laws 1851, c. 122, to pay dues, does not originate in section 7 of the act providing that no holder of redeemed shares shall claim to be exempt from paying the monthly payments provided for in the articles of association, on the ground that, by reason of losses or otherwise, the association has continued longer than was originally anticipated, whereby the payments made on such shares may amount to more than the amount originally advanced, with legal interest thereon, but the obligation arises out of the articles of association, and the section is applicable only to the adjustment of equities between borrowing and nonborrowing members.

[Ed. Note.—For other cases, see Building and Loan Associations, Cent. Dig. § 21; Dec. Dig. § 17.*]

15. CORPORATIONS (§ 259*)—STOCKHOLDERS—LIABILITY.

A judgment creditor of a corporation may proceed by bill in equity to recover from the stockholders the value of the assets of the corporation representing capital stock, if divided among them, without making adequate provisions for the payment of debts, as the capital stock is a trust fund primarily for the benefit of creditors.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1050–1067; Dec. Dig. § 259.*]

16. BUILDING AND LOAN ASSOCIATIONS (§ 42*)—RIGHTS OF CREDITORS—ESTOPPEL.

The articles of a building association provided for the payment of weekly dues until the land should be purchased and assessed by the association and allotted to the members severally, and that at any time after allotment any member was entitled to a deed on payment of the balance of the assessments. A mortgagee had knowledge of the articles at the time of the taking of the mortgage, and he voluntarily contracted to and gave releases to the association on various lots for sums less than their assessed valuation, with knowledge that the lots were to be deeded to members. This process went on for many years. *Held*, that the mortgagee or those claiming under him were estopped from claiming that the deeds of the lots from the association to its members were void.

[Ed. Note.—For other cases, see Building and Loan Associations, Dec. Dig. § 42.*]

Action by William T. Leighton, in his own behalf and for all other creditors, against the Leighton Lea Association and others. Judgment for plaintiff.

See 62 Misc. Rep. 73, 114 N. Y. Supp. 918.

Burlew Hill (John A. Barhite, of counsel), for plaintiff.

Ednor A. Marsh, Smith, De Graff & Castleman, Heman W. Morris, Reed & Shutt, Charles M. Williams, Clarence E. Shuster, Clarence J. Browning, George A. Carnahan, Adler & Adler, Hale & Bronk, P. Cameron Shutt, Edward Lynn, Harris, Havens, Beach & Harris, Albert L. Shepard, Satterlee, Bissell, Taylor & French, McGuire & Wood, Eugene C. Denton, Webb & Vandermark, George A. Gillette, Herbert J. Menzie, Lynn Bros., George E. Tinklepaugh, Chamberlain & Page,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

James R. Davy, Myron T. Bly, Willis K. Gillette, Jay K. Smith, George C. Wolcott, and Thomas A. Sullivan, for defendants.

SUTHERLAND, J. This is a judgment creditor's action brought against the Leighton Lea Association and its stockholders to enforce collection of a judgment of deficiency entered July 27, 1903, for $26,-077.70 arising on the foreclosure of a mortgage given to secure the payment of a portion of the purchase price of a tract of land obtained by the association for the benefit of its members, and also to collect a judgment for $216.95, recovered October 28, 1902, upon a promissory note given by the association. The Leighton Lea Association was incorporated March 13, 1891, pursuant to chapter 122 of the Laws of 1851, providing for the incorporation of building, mutual loan, and accumulating fund associations. The land was purchased by the association in 1891. A tract of about 40 acres, then in the town of Brighton adjacent to the eastern boundary of Rochester and now within the city limits, was conveyed by Kate B. Leighton as executrix to J. Z. Culver. Culver deeded a portion thereof, being 200 building lots, to the association, and held back the balance in his own name. Ten thousand dollars was paid in cash to Kate B. Leighton as executrix by the association, and a bond and first mortgage for $60,000 was given to her by the association, payable in 10 years from its date, with semiannual interest, thus making up the full $70,000 purchase price which Culver had agreed she was to receive for the entire tract conveyed to Culver. A bond and second mortgage for $50,000 was also given by the association to J. Z. Culver, as trustee, payable in 10 equal annual installments, with interest. This made $120,000 to be paid by the association for the tract; but the mortgagee, Culver as trustee, agreed to grade the streets, lay sidewalks, and plant trees as part consideration for the mortgage held by him, and the capital stock of the association was fixed at $120,000. The $50,000 mortgage was discharged in 1893, as will hereafter appear. Various payments were made upon the Leighton mortgage during the 10-year term, and when the balance of the principal sum was about to fall due, the time of payment of the mortgage was extended 18 months by a formal instrument duly executed. During the extended period the association made default in the payment of the interest and taxes, and an action to foreclose the mortgage and to obtain a deficiency judgment was commenced in September, 1902. The usual judgment of foreclosure was granted and entered June 3, 1903; the amount then adjudged to be due being $26,913.95, with $469.67 costs. The sale took place July 8, 1903; the aggregate sum realized at the sale being $12,496, most of which sum was used for the payment of taxes remaining unpaid, leaving only $1,080.04 to be applied upon the amount adjudged due the plaintiff, and a deficiency was reported and a judgment therefor rendered in favor of the plaintiff and against the Leighton Lea Association July 27, 1903, for $26,-077.70. Execution was issued and returned unsatisfied. The promissory note stated in the second cause of action was made by the association to S. D. Bentley December 2, 1899, due thirty days after its date, for $180. An action was brought by the transferee of the note October

20, 1902, and judgment was recovered October 28, 1902, and execution returned nulla bona.

The individual defendants are now brought into court charged, first, as debtors to the Leighton Lea Association upon unpaid stock subscriptions, and for dues under section 7, c. 122, Laws 1851, as amended; and, second, as stockholders alleged to be liable for its debts by virtue of section 11 of the loan association act, which makes stockholders of such associations liable to creditors to the amount of the stock held by them; and, lastly, a basis of liability not outlined in the complaint has been urged at the trial and in the arguments of counsel for the plaintiff, in that some of the defendants received deeds of lots from the association, which land represented a portion of the capital stock of the corporation and constituted a trust asset in which the stockholders could not legally participate until the creditors were paid in full, and hence that those defendant grantees must account to the creditors therefor.

At the opening of the trial a motion was made by the defendants to dismiss the complaint upon various grounds which were fully considered (Leighton v. Leighton Lea Ass'n, 62 Misc. Rep. 73, 114 N. Y. Supp. 918), and it was held that the plaintiff has no cause of action based upon the statutory liability of stockholders under section 11 for the reason that the mortgage debt was not payable within two years from its inception, and for the same reason it must now be held that there is no statutory cause of action upon the note set forth in the complaint, because suit was not brought against the association to recover thereon within two years after the note became due.

It will not be necessary to again discuss the subject of a statutory liability, because the views of the court were fully set forth in that aspect of the case in the opinion above referred to. But the plaintiff may enforce and have applied upon his judgment any claim or right of action set forth in the complaint which the Leighton Lea Association had against any of the defendants on the 20th day of August, 1906 (or on such later date as the action was commenced against such debtor to the association). The complaint declares that certain of the defendants are indebted to the association upon stock of the association subscribed for by them and not fully paid; and a claim is further made in the complaint that under section 7 of the act under which the association was incorporated the defendants are liable to pay dues to the association until an amount is realized therefrom sufficient to pay all the debts owing by the association, and that this obligation is in the nature of a debt which a judgment creditor may enforce.

The character of the association and the nature of its articles of incorporation are set forth in the complaint, the main features of which are referred to in the previous opinion herein, and need not now be repeated. Suffice it to say that the general plan of the association outlined in its articles was that the association should purchase a tract of land, and that the capital stock of the association should be $120,000, consisting of 200 shares, fixed in the first instance at $600 per share, the number of shares corresponding with the number of lots in which the tract was divided, and that, after a payment amounting to $40 on

each $600 had been made, there should be a division of the lots among the members, the lots being assessed at certain valuations, and, after the drawing, each member should be considered as holding stock in the association to the amount of the assessed valuation of the lot drawn by him, and he should thereafter continue to pay dues to the association upon a share or stock interest equal to said value of his lot; the total assessed value of all the lots owned by the association aggregating $120,000, the amount of the total capital stock.

The articles of association provided that when any member had paid to the association in the form of dues the full amount of the estimated valuation of the lot drawn by him, together with interest and taxes, that member should have the right to an absolute warranty deed, conveying to him a clear title of the lot, and at the end each member would also have the right to share in any surplus profit then remaining in proportion to the interest of the member in the association. In the Leighton mortgage it was provided that, on payment to the mortgagee of $600, a release would be given of any lot on Park avenue in said tract, and, on the payment of $300, a release would be given of any other lot in the tract; and it became the duty of the association, when the member had paid in the full assessed valuation of his lot, to obtain a release of the lot from the mortgage.

A large number of persons joined the association; but dissensions soon arose among the members, for it transpired that members were not all in on the same floor, and that the mortgage to J. Z. Culver as trustee was held by him for the benefit of the first 50 members of the association, called "syndicate members," and that the Leighton estate, for the consideration of $70,000, had conveyed to Culver not only the 200 lots conveyed by Culver to the association, but certain other contiguous and valuable land which Culver had not turned over to the association. Mrs. Leighton had not only taken the bond and mortgage of the association for that amount covering the association's 200 lots to secure the $60,000 unpaid, but, in addition, Culver had given her his personal bond and a mortgage for the same amount upon the extra contiguous land conveyed by her to him, the latter mortgage being expressed as securing the payment of the $60,000 bond given by the association. Eminent counsel was employed by the association, and after considerable discussion the $50,000 mortgage was discharged; and an action having been brought by the association against Culver to compel the transfer by Culver to the association of the extra land which Culver had obtained from the Leighton estate, as a further condition of a settlement of the entire dispute, a portion of the land withheld by Culver from the association was deeded to it, and the constitution of the association was amended so that the additional land was brought into the association tract, and a resubdivision of the enlarged tract was made and a redrawing of lots provided for, which took place October 26, 1893. Each syndicate member had contributed at the organization $300 in cash, making $15,000 in all, of which the association had full benefit; but, as part of the settlement, it was agreed and incorporated into the new constitution that each syndicate member should receive credit of $612 upon his stock subscriptions. Twelve dollars

interest was allowed upon each $300 actually paid, and the additional $300 represented what the association decided to allow each syndicate member in consideration of the cancellation of the $50,000 mortgage, and in consideration of the deeding of the land by Culver to the association. Some of the syndicate members claimed at the time that they were entitled to share with Culver in the land withheld by him from the association on the ground that Culver in taking the deed from Mrs. Leighton was acting for the syndicate. If that was the fact, the syndicate (subject to the right of the association) could have compelled Culver to allow them to share with him in the benefit of his purchase. Brewster v. Hatch, 122 N. Y. 349, 25 N. E. 505, 19 Am. St. Rep. 498. The association, however, claimed that Culver's purchase should be held to be for the benefit of the association which he and the syndicate members formed. The final adjustment was made as indicated, under the advice of the counsel employed by the association, and was approved at a meeting called for that purpose upon due notice, and the amended constitution was adopted which ratified and confirmed the settlement.

It is now claimed by plaintiff that this credit of $300 to each syndicate member upon the lot drawn by him is without consideration; but I do not think it can be so held. The settlement of the disputed question made in good faith, the cancellation of the mortgage, and the conveyance to the association of a portion of the Culver land furnished a consideration which will support the credit of $300 against the plaintiff's claim. That the amended constitution was duly adopted has been adjudicated by the Appellate Division of this department. Buker v. Leighton Lea Ass'n, 63 App. Div. 507, 71 N. Y. Supp. 610. Indeed, the complaint says that the amended constitution was duly adopted. It became operative in 1893, and has been recognized and acted on by the association ever since; and it would seem remarkable if in an action brought 13 years thereafter a settlement thus made and acquiesced in should be now overturned; and accordingly I hold that the credit of $300 to each syndicate member is valid as to the plaintiff and all other creditors of the association.

But there are subscribers who have not been released by the association from their obligation, and who have not paid for their stock in full. Some of those subscribers ceased paying dues; and the association, exercising the option which it had under its articles, duly declared the rights of those subscribers forfeited because of their default. The association kept the money which those subscribers had paid in, and in some instances disposed of the lot originally drawn by those subscribers to other members. In other instances, the lot representing the share thus forfeited was never sold by the association and was sold under the foreclosure. In either event, there being no fraud in the transaction, a member whose share was declared forfeited is not now liable. Mills v. Stewart, 41 N. Y. 384.

Some subscribers whose shares were not forfeited have not paid in full for their stock, and never received a deed. Of these some stopped paying without any default on the part of the association; and others did not stop paying until they ascertained that the association could not give them a clear title to their lots because it had not sufficient

money to make the requisite payment upon the Leighton mortgage to secure a release. From these members whose shares were not forfeited, the plaintiff has the right to insist upon the payment of the balance due upon the stock subscriptions, unless the claim of the corporation is barred by the statute of limitations. The inability of the member to obtain a lot does not relieve him from paying for his capital stock; the association having now become insolvent. Cook on Corporations (6th Ed.) §§ 189, 190, 193; Phœnix Warehousing Co. v. Badger, 67 N. Y. 294; Buffalo & J. R. R. v. Gifford, 87 N. Y. 294; Preston v. Rockey, 185 N. Y. 186, 77 N. E. 1156.

But in my opinion the plaintiff cannot recover for unpaid stock subscriptions against a member who has pleaded the statute of limitations, unless some payment has been made by the member upon that subscription within six years prior to the commencement of this action. Cook on Corporations, § 195. The dues were payable each week. No call or other action by the board of directors was necessary to put the member in default, and the association had a right of action to recover each week's dues as it became payable. For the purpose of ascertaining when the subscription was due, let us begin with the second constitution, disregarding for the moment all sums paid prior to the adoption of the second constitution. Article 2, § 2, Const., as amended May 11, 1893, provided as follows:

"Dues. A member who shall not have paid in full for his or her share or lot shall resume the payment of weekly dues of two dollars upon each of such shares or lots as of the first day of March, 1893, and pay the same until July 1st, 1893, and thereafter forty cents per week on each one hundred dollars of the appraised value of said lot or lots, with interest on all sums remaining unpaid on said lot or lots, computed semiannually."

As the redrawing of lots did not take place until October 26, 1893, there was a suspension of the obligation to pay dues from July 1st until October 26th, when dues became payable at the rate of 40 cents per week, beginning then, upon each $100 of the valuation of the individual lots drawn by the member. There would have been due prior to that time by the new constitution $32 upon each $600, or $5.33 upon each $100 of stock originally subscribed, which would leave $94.66 to be paid in weekly installments of 40 cents upon each $100 of new lot valuation, commencing October 26, 1893, making the last payment due about May 18, 1898. The right of action of the association against the subscriber for the final installment would then be barred by the six-year statute of limitations May 18, 1904. This action was not commenced until August, 1906, and the right of the corporation to sue upon unpaid subscriptions had been barred by the statute of limitations unless payments were made by the member on his account after August, 1900.

The plaintiff has with great confidence called the attention of the court to Christensen v. Quintard, 36 Hun, 334, Handy v. Draper, 89 N. Y. 334, United Glass Co. v. Vary, 152 N. Y. 121, 46 N. E. 312, and other cases, in support of the proposition that the plaintiff, as a judgment creditor, was in no position to sue until he had obtained judgment against the corporation and had exhausted his remedy by execution, and that, therefore, the statute of limitations did not begin to run

until the return of the execution unsatisfied. But I think the distinction must be kept clear at this point between a statutory right of action against the stockholder, which is given directly to the creditor (or a right of action to set aside a fraudulent transfer), on the one hand, and a cause of action in which the judgment creditor stands in the place of the corporation judgment debtor and can enforce only such right of action as his judgment debtor possesses in its own right. In the first class of cases the statute of limitations does not ordinarily begin to run until the recovery of judgment against the corporation by the creditor; but, in so far as this plaintiff is now invoking by substitution the right which the Leighton Lea Association had against the subscribers for its stock, the statute of limitations would seem to me to be a defense as against the plaintiff if it would be a defense against the corporation. In some of the cases cited, the stock subscription was payable in such installments as are called for by the board of directors, and in such case the statute does not begin to run until there is a call, or until the corporation becomes insolvent. But in the case at bar, no call was necessary. The dues were payable at the periods stated in the articles of association, and the corporation could have sued for each week's installment as it fell due. The views here expressed are possibly not in harmony with some things which were said by the General Term of the Second Department in Christensen v. Quintard, supra; but it seems to me, with all due respect, that, upon a right of action purely representative, founded upon the contract of subscription itself, and not arising by virtue of a statute, the statute of limitations is a bar six years after the subscription is due. About 90 members of this association received deeds either in their own names or in the names of persons nominated by them to take the conveyance which the constitution guaranteed to each member paying in full for his assessed portion. The credit of the syndicate members has been discussed. The other credits are not questioned, except that plaintiff claims more interest should have been charged, and also that allowances in some instances were improperly made to members upon transfers of credits standing on the books for payments made by other members.

The right to interest upon unpaid stock is conferred by section 2, art. 2, Amended Const., which has been quoted above. In the computation of interest submitted on behalf of the plaintiff, interest appears to be charged from January 1, 1893, as if six months' interest fell due July 1, 1893; but, as I construe that section, interest did not begin to accrue until July 1, 1893, and the first installment fell due January 1, 1894, to be computed on the amounts "remaining unpaid on said lot or lots." This is the method of computation adopted by the association. When payments were made upon principal during any six-month period, it seems that the association charged each subscriber at the end of the period with six months' interest upon the entire amount unpaid at the beginning of that period, added the interest to said amount, and then subtracted whatever intervening payments had been made and reckoned interest for the next six months upon the balance as a new principal. This method is as favorable to the association as

one could reasonably ask.  Where no intervening payments were made during the six-month period, I do not think the association was entitled to interest upon interest.  It is true the installments of interest were due, not as damages for delay, but as part of the payments contracted for; and subsequent payments of principal in such case do not waive the right to insist upon interest previously accrued, which was contracted for.  Smith v. City of Buffalo (Sup.) 39 N. Y. Supp. 881; Watts v. Garcia, 40 Barb. 656.  But interest upon that interest cannot be compelled.  Fake v. Eddy's Ex'r, 15 Wend. 76.  And see Devlin v. Mayor, 131 N. Y. 123, 30 N. E. 45.  I have tested a number of the interest accounts, and do not find that the association failed to credit itself with any interest to which it was entitled.  If, in any instance, there is any such failure, under the method of interest computation adopted by the court, the plaintiff may point it out before the judgment is entered.

As to the transposition of credits from one member to another, it would seem that the plaintiff has fallen into some misapprehension as to what was actually done in this respect.  The secretary's minutes of the meeting held October 13, 1893, at which the amended constitution was adopted, show among other things that the following took place:

"Mr. Steele thereupon offered this resolution: Whereas, we are desirous of retaining as many members as possible, and whereas, it may happen that a member having more than one lot may be unable to keep up payments on all of them, and may wish to consolidate all payments on one or more of such lots. Therefore resolved, that the board of directors be hereby authorized to consolidate the payments of any member on one or more lots whenever they shall deem it for the best interest of the association.  Seconded.  After some discussion, Mr. Steele accepted an amendment, providing that the resolution shall apply only to existing members, and shall not remain in force after ninety days from this date.  On being put to vote the same was carried."

Acting under this authority, and within the 90 days limited for the operation of the resolution, certain members who had taken several lots or shares and made payments upon all of them were allowed to drop one lot and transfer the credits which had been applied upon that lot to one or more of the other lots owned by said member.  The lot thus dropped was relinquished to the association, and thereafter held by the association subject to sale as if the lot had never been apportioned to a member.  The instances of such transfer of credit were very few.  There is no evidence of bad faith, and it would seem out of all due order to now seek to rescind those transactions after 17 years have gone by, and it is no longer possible to restore the parties to their former status.  Later in the history of the association there were transfers of credit, where a member who had paid upon one lot was allowed by the association to exchange it for another which the association had for sale.  The first lot was relinquished to the association and all payments transferred to the substituted lot, and all subsequent payments were made thereon.  In nearly every instance the price of the substituted lot was greater than the price of the lot relinquished; so, on the whole, the association probably gained more than it lost by permitting such transfers, but so many years have intervened that it is now impossible to restore the parties to their original positions, and it would

be grossly inequitable to charge the members with the payment for the lots relinquished under those circumstances.

Now we come to the proposition that under section 7 of the act of 1851 there is an obligation on the part of every shareholder to pay dues on his stock until a sufficient amount is realized to pay all the creditors of the company. That is based upon the provision that:

"No holder of redeemed shares shall claim to be exempt from making the monthly payments provided in the articles of association, upon the ground that by reason of losses or otherwise the association has continued longer than was originally anticipated, whereby the payments made on such shares may amount to more than the amount originally advanced, with legal interest thereon."

Under this section it is claimed by the plaintiff that the obligation of all shareholders is unlimited and is practically that of partners, except that the dues are not payable all at once, but periodically.

I do not regard that as the real effect of section 7. Its language is negative. The obligation to pay dues does not originate in section 7. It arises out of the articles of association. By way of precaution section 7 says that the holders of redeemed shares shall not claim exemption from the obligation to pay dues for the reason mentioned in section 7. It seems to me rather that the intention of the Legislature in that section was to prevent inequality between two classes of shareholders, rather than to put upon all or part of the members the extraordinary obligation of continuing to pay dues until all debts are paid. If it had been the intention of the Legislature to put any such obligation upon all shareholders, the language would not have been confined to the holders of redeemed shares alone. No such distinction between borrowing and nonborrowing members could have been contemplated; and, if the liability was to be unlimited on the part of all the shareholders of the loan associations, why was it necessary to enact section 11 saying that shareholders were liable to creditors "to an amount equal to the amount of the stock held by them respectively"? If we read the original act of 1851 in its entirety, we find that it is expected that associations will do either of two things: either with the funds of the association purchase property for its members, or hold the contributions of its members as a fund, to be either loaned to its members upon suitable security or held until a sufficient sum is realized so that each member may withdraw the face value of his stock. And section 7 is applicable to the adjustment of the equities between borrowing and nonborrowing members; but the language is not appropriate to create a liability which does not exist except by statute, making a stockholder liable as a partner without any maximum limit whatever. If any such extraordinary liability is to be placed upon shareholders of a corporation, it should be evidenced by language which is clear, and should not be inferred from ambiguous or doubtful phraseology.

It has been urged with great earnestness that the land represented the contributions of the members to the capital stock of the association, and that the deeding of the land to the members caused a partition or division of this capital stock among the stockholders, and that such a division must of necessity be subject to the claims of ex-

isting creditors. The general principle is clearly recognized that a judgment creditor may proceed by a bill in equity to recover from the stockholders the value of the assets of the corporation representing capital stock, if divided among them without making adequate provision for the payment of debts, as the capital stock is considered a trust fund primarily for the benefit of creditors. Wood v. Dummer, 3 Mason, 308, Fed. Cas. No. 17,944; Bartlett v. Drew, 57 N. Y. 587; Hastings v. Drew, 76 N. Y. 16. The trust fund doctrine announced by Judge Story in Wood v. Dummer, supra, has been recognized uniformly in this state. Darcy v. Brooklyn & New York Ferry Co., 196 N. Y. 99, 89 N. E. 461. But the deeding of the land, as soon as the assessed valuation thereof was paid by the member to the association, was provided for in the articles of association. Section 2, article 2 of the first constitution provided as follows:

"Dues. Each member, who shall not have paid in full for his or her share, shall pay at the regular meetings weekly dues of $2 upon each of his or her shares from and after the 30th of March, 1891, until said land shall be purchased and assessed by the association and allotted to the members severally, and thereafter the same upon the value of his or her shares or lots as assessed by the association. At any time after allotment any member is entitled to clear warranty deed of any of his or her lots upon payment of the balance of the assessments remaining unpaid thereon and interest and taxes. All previous fines must be paid with each payment of dues. No partial payment shall be received."

The articles of association were part of the public records before the mortgage was made, and the mortgagee had knowledge thereof before she accepted the association as her debtor. She was not bound under her contract with Culver to take the association's bond or mortgage. Indeed, it would seem that the Culver option had expired when she finally conveyed the land; and, with that plan before her, Mrs. Leighton certainly was not misled as to the purposes of the association, or the expectation of the stockholders as to receiving deeds when they paid in full their quota of the capital stock. Her knowledge of the situation before she became a creditor precluded her from remedies which a creditor, without such knowledge, might have invoked. Rickerson Roller Mill Co. v. Farrell F. & M. Co., 75 Fed. 554, 23 C. C. A. 302. She voluntarily contracted to and did give releases to the association upon these various lots for sums less than their assessed valuation, knowing that the lots were to be deeded to members, and so did the plaintiff later. This process went on until 1902. No suggestion appears to have been made that the general plan of the association was invalid as to creditors until after the mortgage had been foreclosed, the remaining lots sold, and until after this action was commenced. That plan is not assailed even in the complaint in this action. The attack was first made, it seems, at the trial after the court had held that there was no statutory liability upon these defendants. During these many intervening years since the association was formed, the situation has greatly changed. Some members have died, others have become insolvent, or have left the jurisdiction of the court. The opportunity to adjust the equities of the stockholders as between themselves is practically extinguished by the lapse of time and change

of circumstances; and, if the doctrine of estoppel has any place in our law, it should be effective in this instance to prohibit the plaintiff from now claiming that the deeds of the lots from the association to its members are void, or that he has a claim upon the lots or against the defendants because of the disposition of the property thus encouraged and abetted by the Leightons themselves.

The plaintiff may file for the inspection of defendants on or before March 22d a computation of amounts claimed to be due as of March 26, 1910 (following the method of interest computation herein approved), from the defendants Peter Grimes, Joseph Z. Culver, John A. Nagle, J. Austin Young, Dennis Doud, and John N. Hanna, who seem to be the only defendants against whom the plaintiff is entitled to recover.

Findings and an interlocutory decree will be settled March 26th, at which time counsel may be heard as to costs.